**NATIONAL BUSINESS LISTS, INC., Plaintiff,**

v.

**DUN & BRADSTREET, INC., Defendant.**

**No. 74 C 3516.**

United States District Court, N.D. Illinois, E.D.

June 11, 1982.

Altheimer & Gray, Susan S. Henderson, Benjamin D. Schwartz, Lionel G. Gross, K.R. Gaines, Chicago, Ill., for plaintiff.

Kirkland & Ellis, John H. Morrison, William P. O'Neill, Don H. Reuben, William H. Pratt, Lawrence Gunnels, Thomas F. Ging, Keith C. McDole, Sidney N. Herman, Fred H. Bartlit, Jr., Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER

MORAN, District Judge.

In this action National Business Lists, Inc. (NBL) brought a monopolization claim against Dun & Bradstreet, Inc. (D & B) and D & B counterclaimed for copyright infringement and breach of contract. After an extended trial the jury rejected the NBL antitrust claim and found for D & B on both its copyright and contract claims, awarding substantial damages. NBL thereafter filed post-trial motions on a variety of bases. Only certain of the contentions respecting the intellectual properties issues will be here addressed.

A consideration of those issues requires a somewhat extended description of what D & B is seeking to protect and how NBL obtained and used the material for which protection is sought. Most of the facts are not in dispute; those which were disputed were largely determined, implicitly or explicitly, by the jury verdict.

D & B has, for many years, published credit reference books as part of its credit reporting services. The information there published is grouped by municipality. The listings of businesses for each municipality are alphabetical and include the standard industrial classification (SIC), which identifies the type of business; the name of the business; the year established if within the last ten years; an indication if the business is a corporation; an indication if the business did not appear in a previous edition of the publication; and an indication of financial worth and creditworthiness if that information is available to D & B. The information published is the result of extensive field reporting by a nationwide force of D & B employees who periodically visit the businesses listed in order to update and verify the information and who, on a continuing basis, provide information about new businesses for inclusion in the publication. The credit reference books are copyrighted and are made available to subscribers under contractual confidentiality restrictions.

D & B also publishes certain other reference works derived from its field reporting. One is the Reference Book of Manufacturers, which includes data pertaining to number of employees. Other subsidiary D & B reference publications are the Million Dollar Directory, the Middle Market Directory and the Metalworking Directory, in which the listings are on the basis of size or industry. Those three publications provide executive names and positions. Those books are also made available to subscribers under contractual confidentiality restrictions and are copyrighted.

NBL is not engaged in providing credit reporting services. Since 1955 it has been selling mailing lists. The original basis for its lists was the D & B credit reference

book. The information from that publication, which is fed into NBL's computer data base or master file, now includes all the information in the credit reference books and the employee number data from the Reference Book of Manufacturers. Originally all, or almost all, of the names in the NBL master file came from the D & B credit reference books. Over time the items of information included in the master file increased in number and telephone directories became a primary alternate source of names. Those directories also provide additional information for the master file, although the updating of the master file continues to begin with the D & B credit reference books.

New names in the credit reference books are checked by NBL against telephone directories to get addresses and telephone numbers and to verify that the business listed by D & B still exists, and is properly named and located by municipality. SIC numbers are checked against the telephone classified pages. In addition, more than 4,000 classified directories are reviewed for names which do not appear in the credit reference books. Presently NBL gets more than half of its new names from the Yellow Pages. The information respecting businesses previously included in the master file is checked against the subsequent credit reference book information. The procedure for updating the master file is a substantial undertaking.

The customer does not itself receive much of the information contained in the computer data base. Its interest is mailing lists which reach a particular market. The customer, therefore, orders mailing lists of all businesses in the NBL master file which are in a specific area, have a particular SIC number, have a number of employees in excess of a certain number or in other ways can be targeted on the basis of the information contained in the data base.

The process of acquiring information from the Million Dollar Directory, Middle Market Directory and Metalworking Directory, is substantially different. During the past several years a consortium including NBL and various of its competitors has employed someone to turn those directories, as well as certain other directories, into an executive name mailing list. The annual process of transferring the information from those directories into computer tapes capable of producing mailing lists is relatively simple and inexpensive.

When NBL began marketing mailing lists D & B was not a competitor. Only later did D & B establish computer programs suitable for accessing its credit information for mailing list purposes and D & B thereupon entered into that business. D & B did not expressly complain that NBL's use of the D & B publications violated both contract rights and copyrights until it filed its counterclaim in 1975, and its claim for damages was confined to damages arising from copying after the filing of its counterclaim.

Besides damage contentions, NBL objects to the verdict for a number of reasons, all of which it urges require judgment N.O.V. or a new trial. It does not question that D & B had valid copyrights. It contends, however, that what it was doing cannot be copyright infringement, that it was not a breach of any enforceable contract, that D & B is in any event estopped to assert any infringement or breach, and that contract claims are preempted by federal law. The court agrees, to some extent, with NBL's estoppel contentions. But consideration of that issue requires some prior discussion of the copyright claims.

Just as NBL's antitrust claim was at the outer boundaries of antitrust law, so is D & B's copyright claim at the outer boundaries of copyright law. The extent to which compilations are entitled to protection as intellectual property has been and continues to be a troublesome legal issue because it involves consideration of competing interests within the confines of a statutory scheme better suited to other literary works.

While the Copyright Act of 1976, like the prior statute, was enacted to further the public interest and not the interests of those seeking to profit from their intellectual properties, it is premised on a recognition

that creativity is fostered by affording protection against copying by others. "[T]he real purpose of the copyright scheme is to encourage works of the intellect, and . . . this purpose is to be achieved by reliance on the economic incentives granted to authors and inventors by the copyright scheme." *Universal City Studios v. Sony Corp. of America,* 659 F.2d 963, 965 (9th Cir.1981). That protection extends beyond the copying of the literary work itself to appropriation by derivative works, such as the motion picture version of a copyrighted novel. 17 U.S.C. §§ 101 and 106. Copyright protection does not extend, however, "to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. § 102.

Compilations such as the D & B publications are collections of facts arranged in a systematic manner in order that those who wish the information may readily have access to it. They are expressly made the subject matter of copyright by 17 U.S.C. § 103(a). NBL contends, however, that copyright protection of compilations is severely limited. It argues that a finding of infringement requires that the allegedly infringing compilation serve the same purposes as, and is intended to compete with, the copyrighted compilation; that the facts in the second compilation are organized and presented in a manner which closely parallels their *organization and presentation in the first;* and that the author of the second compilation used the facts contained in the first as the exclusive source of his information and engaged in *no substantial independent work* in using the facts obtained from the copyrighted work. It maintains that none of those three factors are present here. The scope of protection is not, however, so severely limited.

Compilations such as D & B's have value because the compiler has collected data which otherwise would not be available. The compiler's contribution to knowledge normally is the collection of the information, not its arrangement. If his protection is limited solely to the form of expression,

the economic incentives underlying the copyright laws are largely swept away. Recognizing this, the courts have long afforded protection under the copyright laws against appropriation of the fruits of the compiler's industry.

That protection does not fit nicely into the conceptual framework of copyright law and has for that reason been criticized. *See* 1 *Nimmer on Copyright* § 3.04 (1981). It has been suggested that the act of aggregating isolated pieces of information can be authorship, with the resulting collection of data being a work of authorship. Denicola, "Copyright in Collections of Facts: A Theory for the Protection of Nonfiction Literary Works," 81 Colum.L.Rev. 516 (1981). The courts have generally rested, however, not on an analysis of copyright concepts but on the economic incentives premise of the copyright law and the injustice of permitting one to appropriate the fruit of another's labor. *But see Jeweler's Circular Publishing Co. v. Keystone Publishing Co.,* 281 F. 83, 88 (2d Cir.1922), *cert. denied,* 259 U.S. 581, 42 S.Ct. 464, 66 L.Ed. 1074 (1922): "The man who goes through the streets of a town and puts down the names of each of the inhabitants, with their occupations and their street numbers, acquires material of which he is the author." That concept of authorship is, moreover, supportable by the language of the Copyright Act of 1976, which defines compilations as "a work formed by the *collection* and assembling . . . of data that are *selected,* coordinated, *or* arranged in such a way that the resulting work as a whole constitutes an original work of authorship." 17 U.S.C. § 101 (emphasis supplied). And the protection of copyright extends to protection against derivative works, which include any form "in which a work may be recast, transformed, or adapted." 17 U.S.C. §§ 101 and 106. Finally, 17 U.S.C. § 103(b) distinguishes between material contributed by the author of a compilation and preexisting material, granting protection to the former but not to the latter.

More importantly, the Copyright Act of 1976, largely a codification of prior law,

expressly validates copyright protection of compilations. While protection of the fruit of a compiler's labor may be a doctrine in search of conceptual underpinnings, it was established law long before the statute was enacted. Indeed, in this case the alphabetizing of a list of names could hardly have been the originality which Congress meant to reward.

Before discussing that law it is helpful to recognize that the D & B information relied upon by NBL covers virtually the spectrum of the directory cases. 1975 is the conceded initial reference point for determining infringement. By 1975 NBL had been relying upon the credit reference books for almost 20 years. In 1975 and thereafter it was checking its master file against the more recent credit reference books and, from those books, adding new names and noting changes in old listings. With respect to the names, then, D & B's charge of infringement could only encompass the new names added in 1975 and thereafter, since the 1975 and subsequent copyrights D & B claims were infringed cover only the supplemental material. *Adventures in Good Eating v. Best Places to Eat,* 131 F.2d 809, 812–13 (7th Cir.1942); 17 U.S.C. § 103(b).

Those new names have been a starting point, from which NBL engages in the verification previously described, a procedure often described as "slipping." *See* Gorman, "Copyright Protection for the Collection and Representation of Facts," 76 Harv.L. Rev. 1569, 1585 (1963). NBL does not make its own contemporaneous canvass and then verify its results against the credit reference books to determine whether there may be some names it has omitted. The use of the SIC designations is somewhat similar, with the original classification code having as its source a government publication. Of the other three principal information components used for the master file, two (the financial worth data from the credit reference books and the number of employees data from the Reference Book of Manufacturers) are "facts" determined by D & B and accepted by NBL without verification, and the third (creditworthiness data from the credit reference books) is a D & B judgment based upon its credit investigation. None is verified. Finally, the executive names and positions in the three special directories are converted annually into mailing lists, without verification. NBL concedes that all of that information is copied in the literal sense.

Courts have often, as contended by NBL, rested upon similar arrangement as the bases for infringement findings in directory cases. In some instances that has been necessary to determine whether there was copying, which defendant denied. *See e.g., Adventures in Good Eating v. Best Places to Eat, supra; Sammons v. Larkin,* 38 F.Supp. 649 (D.Mass.1940), modified on other grounds 126 F.2d 341 (1st Cir.1942); *Produce Reporter Co. v. Fruit Produce Rating Agency,* 1 F.2d 58 (N.D.Ill.1924). On occasion much of the compilation was not covered by copyright and, accordingly, only the arrangement was protected. *Flick-Reedy Corporation v. Hydro-Line Manufacturing Company,* 351 F.2d 546, 548–49 (7th Cir. 1965), *cert. denied,* 383 U.S. 958, 86 S.Ct. 1223, 16 L.Ed.2d 301 (1966), *see Hartfield v. Peterson,* 91 F.2d 998, 999 (2d Cir.1937). Certainly the common supposition that the information in one compilation can be profitably copied and used only by a competing compilation has made it convenient to use the customary language of copyright to equate infringement with the copying of the arrangement. *See e.g., Benny v. Loew's Incorporated,* 239 F.2d 532, 536 (9th Cir.1956), *aff'd.* 356 U.S. 43, 78 S.Ct. 667, 2 L.Ed.2d 583 (1958); *W.H. Anderson Co. v. Baldwin Law Pub. Co.,* 27 F.2d 82, 89 (6th Cir.1928). Protection of arrangement has, however, generally been invoked when the directories were similar, and even then in tandem with the concept that a compiler is not to be denied the fruit of his labor. Rare are the cases in which a copier has escaped liability for substantial copying solely because he changed the form of his compilation and thereby avoided similarity of expression. *Cf. Triangle Publications, Inc. v. Sports Eye, Inc.,* 415 F.Supp. 682 (E.D.Pa.1976).

The emphasis upon the protection of the compiler's industry goes back in this country at least almost a century. In *List Pub. Co. v. Keller,* 30 F. 772 (S.D.N.Y.1887) the court, noting that the value of a social register depended upon the judgment exercised in the selection of names, concluded that the defendant could not take the results of the copyright owner's labor and expense to save the infringer labor and expense. *Id.* at 773.

The protection of the compiler's labor has been a basis for protecting telephone directories, *Leon v. Pacific Telephone & Telegraph Co.,* 91 F.2d 484 (9th Cir.1937); *and see Southwestern Bell Telephone Co. v. Nationwide Independent Directory Service, Inc.,* 371 F.Supp. 900 (W.D.Ark.1974); *Southern Bell Telephone & Telegraph Co. v. Donnelly,* 35 F.Supp. 425 (S.D.Fla.1940); and *Hartford Printing Co. v. Hartford Directory & Pub. Co.,* 146 F. 332 (D.Conn. 1906); rating books, *Produce Reporter Co. v. Fruit Produce Rating Agency, supra;* (*and see Dun v. Lumbermen's Credit Association,* 209 U.S. 20, 28 S.Ct. 335, 52 L.Ed. 663 (1908) where the absence of any attempt to appropriate another's labor negated injunctive relief); hotel and restaurant guides, *Adventures in Good Eating v. Best Places to Eat, supra; American Travel & Hotel Directory Co. v. Gehring Publishing Co.,* 4 F.2d 415 (S.D.N.Y.1925); racing information, *Triangle Publications v. New England Newspaper Pub. Co.,* 46 F.Supp. 198 (D.Mass.1942); jewelers' names and trademarks, *Jewelers' Circular Pub. Co. v. Keystone Pub. Co., supra;* cable and telegraphic codes, *Hartfield v. Peterson, supra;* and garden supplier lists, *Schroeder v. William Morrow & Co.,* 566 F.2d 3 (7th Cir. 1977). See *Quinto v. Legal Times of Washington, Inc.,* 506 F.Supp. 554 (D.D.C.1981).

This circuit has made unmistakenly clear the "work product" foundation of that protection, most recently in *Schroeder v. William Morrow & Co., supra* at 5, where the court relied upon the "industrious collection" cases in reversing the lower court.

NBL contends that directory law is restricted to similar publications in similar form. But *Leon v. Pacific Telephone & Telegraph Co., supra,* found infringement by a reverse telephone directory, in which telephone numbers were listed by address rather than name, a directory in a different form serving a different function. The court there approvingly adopted the view that an "unfair use may be made of one book in the preparation of another, even if there is no likelihood of competition between the former and the latter .... In so doing they have appropriated the result of this labor and expense to their own use, and even if they have injured the plaintiff in no other way, they have at any rate deprived them of the advantage, which their copyright conferred on them, of being able to publish such a book as the defendants' book at much less labor and expense than anyone else." (*Id.* at 487).

In *Chain Store Business Guide v. Wexler,* 79 F.Supp. 726 (S.D.N.Y.1948), a mailing list business converted the name and address of a marketing directory into mailing lists, confident that it could copy the information but not the format. The court summarily found infringement. Similarly, in *Triangle Publications v. New England Newspaper Pub. Co.,* 46 F.Supp. 198 (D.Mass.1942), the translation of racing results from chart to narrative form did not remove the new expression from the reach of the copyright laws. And *see Central Telephone Company of Virginia v. Johnson Publishing Co., Inc.,* 526 F.Supp. 838 (D.Colo.1981).

To recognize that a compiler's industry may be protected under the copyright laws is not to disregard the dangers posed by overly extensive protection. Those dangers have been most often discussed in cases involving non-fiction literary works, where the court's conclusions often appear to depend on whether the emphasis is on the infringer's piratical conduct or on the universality of ideas. Research from Danish sources was protected in *Toksvig v. Bruce Pub. Co.,* 181 F.2d 664 (7th Cir.1950). "[T]he test is whether the one charged with infringement has made an independent production, or made a substantial and unfair use of the complainant's work." (At p.

667). Seven years later a district court found a claim of unfair use of material from an Abraham Lincoln study patently insubstantial. A majority of the Court of Appeals agreed with the result, but with considerable hesitation. *Eisenschiml v. Fawcett Publications,* 246 F.2d 598 (7th Cir. 1957), *cert. denied,* 355 U.S. 907, 78 S.Ct. 334, 2 L.Ed.2d 262 (1957). The dissent called defendant's use piracy. *Id.* at 604. The *Toksvig* standard, however, continued to have the court's approval.

The Court of Appeals for the Second Circuit has been more restrictive in according copyright protection to non-fiction literary works. *See Rosemont Enterprises, Inc. v. Random House, Inc.,* 366 F.2d 303 (2nd Cir. 1966), *cert. denied,* 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967), and *Hoehling v. Universal City Studios, Inc.,* 618 F.2d 972 (2nd Cir.1980), *cert. denied,* 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980). But there appears to remain a lingering recognition that "[t]he second historian or second directory publisher cannot bodily appropriate the research of his predecessor." *Huie v. National Broadcast Company,* 184 F.Supp. 198 (S.D.N.Y.1960). *See Rosemont Enterprises, Inc. v. Random House, Inc., supra,* at 310.

NBL relies heavily upon *Miller v. Universal City Studios, Inc.,* 650 F.2d 1365 (5th Cir.1981), involving a non-fiction literary work, where the court held a jury instruction that research is copyrightable erroneous. The court there restricts protection more than the Seventh Circuit. At the same time it recognizes that its views cannot be reconciled with the directory cases and suggests that the directory cases are a breed apart. *Id.* at 1369–70.

This court respectfully suggests that the directory cases, rather than being a breed apart, are the most striking illustrations in copyright law that the misappropriation doctrine most commonly associated with *International News Service v. Associated Press,* 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918), has there long found a house, if not a home. Compilations, being more the product of diligent application and less the result of intellectual creativity than possibly any other form of protectable work, are at one end of a spectrum extending to art, poetry and music. Diligent application has, through copyright, been accorded a measure of protection because that is the only protection which is meaningful. As we move up the spectrum from texts through non-fiction literary works, "form of expression" protection progressively becomes more meaningful and diligent application appears progressively less entitled to protection if it may adversely affect use of historical knowledge. *See generally* Callman, Unfair Competition, Trademark and Monopolies, § 4.64 (4th Ed.) and particularly fn. 16.

The notions of unfair competition implicit in copyright protection of diligent application do not rest easily in a statutory scheme restricting copying by anyone for a finite period. Concepts of unfair competition presuppose an assessment of the "copyist's" behavior in light of the competitive relationship he has to the copyright owner or at least in light of the impact upon the owner's legitimate expectations of business advantage. Callman, *supra;* Budwig, "The Misappropriation Doctrine after the Copyright Revision Act of 1976," 81 Dickenson L.Rev. 469, 477 (1977). It is not without reason that NBL, in arguing non-infringement, has focused upon the fact that D & B's copyrighted works are prepared for a noncompetitive purpose and that in the diligent application cases the courts have tended to emphasize the egregiousness of the defendant's predatory conduct, *e.g.,* the dissent in *Eisenschiml v. Fawcett Publications, supra.*

If we consider the nature of defendant's conduct, however, this issue is not, as NBL would have it, whether a compilation is entitled to protection only in the form it is published. Rather, the emphasis shifts to a consideration of whether or not the use made of the material is a fair use. A traditional defense in copyright cases and now codified in sec. 107 of the Copyright Act of 1976, "fair use" by its designation implies that competitive relationships, or their absence, are factors relevant to a de-

termination of infringement. While the concept extends well beyond the unfair competition aspects of diligent application cases, whether or not the use is of a commercial nature, the nature of the copyrighted work and the effect of the use upon the potential market for a value of the copyrighted work are all matters which the courts are mandated by sec. 107 to consider. And that mandate flows from prior law, where those factors have all figured prominently in diligent application cases.

In the interest of public knowledge the use of bits and pieces of the information in the compilation cannot be an infringement, as in the case of non-fiction literary works. That conclusion can rest on the premise that information is not itself the subject of copyright. When, however, there is substantial copying, "the question of fair or unfair use arises." *G.R. Leonard & Co. v. Stack, supra,* at 39. The fair use of research is broad, the fair use of compilation information is narrower, but certainly greater than the permissible fair use of more creative products, *Universal City Studios v. Sony Corp. of America, supra,* at 912, because the public interest in dissemination becomes progressively stronger as we move along the spectrum from fancy to fact.

NBL has argued non-infringement in the guise of fair use contentions. Its difficulty is that fair use is normally considered a question of fact, and it had no quarrel with the fair use instructions put to the jury. That does not absolve a court, however, from determining whether a restriction on use is impermissible under the copyright laws, particularly when the facts are largely undisputed.

The analytical context for decision is perhaps best set forth in *New York Times Co. v. Roxbury Data Interface, Inc.,* 434 F.Supp. 217 (D.N.J.1977), a case similar to this in some respects and critically different in others. Defendant there published cumulative name indices to the New York Times Index, which itself correlated a wide range of data on an annual basis to citations to the pages and columns of the New York Times. The defendant's work was itself a considerable undertaking. It was in a sense complimentary to the New York Times Index, since a researcher interested in a person was directed to the New York Times Index. Since defendant did not copy the newspaper page and column citations, a user of defendant's indices could not bypass the plaintiff's index and go directly to the back issues of the New York Times. While the usefulness of defendant's indices is apparent, since it permitted a researcher to avoid the arduous task of reviewing each annual New York Times Index, plaintiff had not itself prepared such a reference tool.

NBL would have this court view the *New York Times* case as a limitation upon copyright. The court there, however, had no doubt that a personal name together with a citation qualified for copyright protection (*Id.* at 221), and it emphasized that defendant had not copied both the names and citations. It was undisturbed by the dissimilarity in form and arrangement. It focused, rather, on whether the defendant's indices were a fair use. This court agrees with Judge Meanor's conclusions that the alleged infringer's profit motive does not preclude fair use and that permitted fair use is broader both when the copyrighted work is a compilation and the allegedly infringing work is not directly competitive. It cannot agree, however, with his dismissal of *Leon v. Pacific Telephone & Telegraph Co., supra,* as a competing directory case. Like *New York Times,* the allegedly infringing work was different in arrangement, served a different purpose and was only potentially competing. Unlike *New York Times,* the offending directory in *Leon* was a simple reversal, easily accomplished by anyone, including the copyright owner, if he but chose to do so. In that respect *Leon* is similar to the mailing stickers in *Chain Store Business Guide v. Wexler, supra,* which were the direct product of directory copying.

Defendant's use in *Chain Store Business Guide* was more within the possible ambit of fair use than NBL's participation in the annual consortium. In *Chain Store Busi-*

*ness Guide* the mailing lists were, apparently, not directly competitive. Here the executive' name lists, drawn in large part from the verbatim copying of the consortium, are directly competitive to the mailing list use D & B makes of its compilation. The only other real distinction from *Chain Store Business Guide* is that the consortium executive names have been fed into a computer. That is a distinction without a difference. The computer programs are, after all, automated electronic compilations. The information is stored without arrangement and form, capable of being called forth as sheets of stickers at the touch of a button. In those circumstances an emphasis upon arrangement and form in compilation protection becomes even more meaningless than in the past. *See* 17 U.S.C. § 117.

■ The executive name tapes involved wholesale copying each year, which itself precludes fair use in the circumstances of this case. *See Leon v. Pacific Telephone & Telegraph Co., supra,* at 486–87, *Walt Disney Productions v. Air Pirates,* 581 F.2d 751, (9th Cir.1978), *cert. denied,* 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 94 (1979); *Universal City Studios v. Sony Corp. of America, supra,* at 971–72; *Schroeder v. William Morrow & Co., supra,* at 6. It is difficult to know, in those circumstances, how the jury could have reached any conclusion respecting those tapes other than infringement.

■ The NBL master file, however, poses some different considerations. In 1975 and thereafter the copying was only incremental, the names and SIC numbers were subjected to verification by a procedure akin to slipping, and only the employee size and credit rating data were appropriated without investigation. But at least some of the information was appropriated without verification. The jury found that the D & B information included in the master file each year was substantial copying and not a fair use. As Learned Hand concluded in the district court opinion in *Jewelers' Circular Pub. Co. v. Keystone Pub. Co., supra,* at 93, it is not necessary to determine whether the slipping procedure followed in verifying

names absolves the alleged infringer since some of the compilation was copied without verification. At the time of the copying, NBL and D & B were in competition in the use of the compiled information. The jury was properly instructed and there was substantial evidence to support its verdict that NBL infringed, beyond fair use, valid D & B copyrights.

The "slipping" question does become germane to damages issues. Even if the use of the names is infringement, NBL contends that the infringement damages awarded by the jury are excessive. While its contention has force, that is an issue we need not reach because of this court's conclusion that as a matter of law D & B is subject to a limited estoppel.

■ We begin with basic premises. "Four elements must be present to establish the defense of estoppel: (1) the party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury." *Hampton v. Paramount Pictures Corporation,* 279 F.2d 100, 104 (9th Cir.), *cert. denied,* 364 U.S. 882, 81 S.Ct. 170, 5 L.Ed.2d 103 (1960).

■ NBL's estoppel contentions respecting executive names are insubstantial. Long before 1975, however, D & B was well aware that a whole industry had grown up relying upon the credit reference book information. There was some evidence that NBL received books originally by indirection, and it can be argued that NBL was not entirely candid in its disclosures of its procedures in using the names. Further, the books contained both copyright notices and contractual restrictions. *See Hampton v. Paramount Pictures Corporation, supra,* at 104. But it is beyond dispute that D & B was, for many years prior to 1975, well aware from industry advertising that mailing list companies obtained names from the credit reference books. Indeed, in 1968 an NBL listing in an industry publication spe-

cifically stated that firm names, SIC numbers and financial strength, were derived from the credit reference book, and that thereafter the information was updated annually by checking it against the credit reference book. D & B, well aware of the listing, asked only that its name not be used in connection with such listings. Its conduct surely encouraged the belief that NBL's business would be unmolested. *See Advanced Hydraulics, Inc. v. Otis Elevator Company,* 525 F.2d 477 (7th Cir.), *cert. denied,* 423 U.S. 869, 96 S.Ct. 132, 46 L.Ed.2d 99 (1975).

Not until 1975 did D & B ever assert that the use of its credit reference books violated its rights, and then only as a defensive counterclaim in this lawsuit and only against NBL. This court is well aware that D & B was not insensitive to the antitrust implications, as well it should be, of refusing to permit continued use of information by competitors, and that its caution in proceeding against others may well be attributable to the pendency of this action. But the industry developed long before D & B became a competitor, and the data bases were created and maintained with at least the tacit acquiescence of D & B. Having provided, without objection, the seed from which an industry has grown, it cannot, in present circumstances, now wholly withhold its continued nurture. *See Saverslak v. Davis-Cleaver Produce Company,* 606 F.2d 208, 212–14 (7th Cir.1979), *cert. denied,* 444 U.S. 1078, 100 S.Ct. 1029, 62 L.Ed.2d 762 (1980); *Continental Coatings Corporation v. Metco, Inc.,* 464 F.2d 1375, 1379–80 (7th Cir.1972); *Seven-Up Company v. O-So Grape Co.,* 283 F.2d 103 (7th Cir.1960), *cert. denied,* 365 U.S. 869, 81 S.Ct. 903, 5 L.Ed.2d 859 (1961).

This case began with a claim for competitive sharing and ended with a successful counterclaim for competitive restriction. This court is not unmindful that estoppel normally extinguishes a past right to restrict future conduct, and that it does not impose upon the one estopped prospective affirmative obligations to act. The concept presupposes that one may continue to use the water in the pond, not require that another replenish the water. But an induced reliance may lead to changes of position by a party from which injury results if the one estopped fails thereafter to act in the prior or customary manner. For example, a municipality which is estopped from preventing the completion of a building under construction is necessarily foreclosed from refusing to issue the usual permits and to make the normal construction inspections. *See e.g., The City of Marseilles v. Hustis,* 27 Ill.App.3d 454, 325 N.E.2d 767 (3d Dist.1975).

D & B's position changed in 1975 from acquiescence to litigious condemnation. But NBL, like its other and smaller competitors, had relied upon that acquiescence for many years prior to D & B becoming a competitor, and it had structured its procedures accordingly. This court, also, cannot be unmindful of the competitive setting in which this case arises. The credit reference books continue to issue in the same form as before. The only changes are that D & B has chosen, and successfully, to become a supplier of mailing lists, it became a defendant, and it ceased to acquiesce. The injury to NBL engendered by its reliance continues if it is now denied the ability to continue the procedures it has long followed.

That reliance is, however, upon procedures, not the wholesale appropriation of information, and the financial worth and creditworthiness data are annually appropriated from D & B. But the procedure for adding new names and verifying the old from the credit reference books, the "slipping" procedure previously described, is a process of accretion. It is beyond dispute that NBL could change its procedures to go first to telephone directories, check the names there obtained or deleted against the credit reference books, and resolve the inconsistencies, and that it could thereby avoid copyright infringement claims by D & B. Its investment is, however, in the procedures it has used, without challenge, for many years, and the estoppel must go beyond the estoppel, which D & B virtually concedes, against restrictions on the use of names obtained prior to the counterclaim.

So long as D & B continues to publish its credit reference books in their present format, this court concludes that it is estopped from prohibiting NBL from following its former procedures for adding new names and verifying old. That estoppel does not, however, extend to the copying of financial worth and creditworthiness data for mailing list purposes. D & B is, of course, under no affirmative obligation to continue to publish credit reference book information in a form usable by NBL.

Because that estoppel applies as well to the contract claims, NBL's other contract contentions need not be considered here. In response to NBL's preemption claim, however, the court does note that Congress expressly recognized in sec. 108(f)(4) of the Copyright Act contractual obligations extending beyond copyright.

Accordingly, NBL's motion for judgment N.O.V. is granted in part and denied in part with respect to the claimed infringement of the credit reference books, and is denied with respect to the claimed infringement by appropriation of other information. NBL's motion for a new trial is granted with respect to damages issues, unless the matter may be resolved by statutory damages, and the motion for a new trial is denied in all other respects. In the event the judgment N.O.V. for NBL is hereafter vacated or reversed, NBL's motion for a new trial is granted with respect to infringement damages and contract damages, on the ground that the damages are excessive.

This court is of the opinion that this order and the companion order respecting antitrust claims issued this day involve controlling questions of law as to which there is a substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation.

The parties are, in view of this memorandum, to submit comments on the pending motion respecting escrowed funds within 14 days and on the pending bill of costs motion within 28 days. Status conference is scheduled for July 6, 1982 at 4:30 p.m.