HERBERT J. GROVER, State Superintendent Department of PublicInstruction
In your letter of June 5, 1985, you ask:
 Would it be contrary to the state public records law for an authority, such as a state agency or local public library board, to enter into a contract for computerized cataloging services which would limit public access to records concerning that authority's holdings which were created on behalf of the authority pursuant to the contract?
The factual bases for your inquiry are complex but need to be understood in detail. You state the following in your letter:
 Since 1975 the Department of Public Instruction, Division for Library Services (hereafter Division or DLS) and numerous public libraries within the state, including libraries in the University of Wisconsin System, have contracted through a statewide network of libraries (the Council of Wisconsin Libraries, known as COWL) to purchase the services of the Online Computer Library Center (OCLC), a not-for-profit corporation in Dublin, Ohio. OCLC operates a computerized cataloging service which utilizes a shared data base of bibliographic records. OCLC provides the computer storage and software necessary to create and manipulate the records, and the member libraries who contract with OCLC create the records by entering the necessary data on their holdings into computer terminals located at each library.
 Member libraries, that is, libraries which have contractually agreed to be part of the OCLC system, have access to the combined catalog records of all libraries in the system, including records contributed by the Library of Congress. Member libraries may search the online data base for catalog records and may also purchase from OCLC printed catalog cards and machine-readable catalog records on tape, which are extracted from information in the OCLC data base. These machine-readable tapes *Page 134 
are an important product to local libraries because they can be transferred from one computerized system to another and may be used in a variety of library automation activities.
 Currently 95 public and private libraries in Wisconsin are members of OCLC and use OCLC's online system to enter cataloging data. Since 1975 DPI has awarded approximately $1.8 million in federal grants to Wisconsin public libraries to assist them in joining OCLC and using the OCLC system for such activities as cataloging, conversion of bibliographic records to machine-readable form, interlibrary loans and for local automation activities.
 In 1982 the Division received permission from all Wisconsin OCLC-member libraries to use their OCLC machine-readable tapes to create a statewide data base to be distributed to all Wisconsin libraries, including non-OCLC member libraries. The Division also developed a microcomputer program which permits non-OCLC libraries to add their holdings to the records in the statewide data base. Once a library has added its holdings to the data base, the library then may extract a complete bibliographic record and use the record for other local automation projects, such as circulation and interlibrary loans. The Division's past practice of providing information in the statewide data base to non-OCLC libraries appears to be jeopardized by recent developments in contract negotiations with OCLC.
 In 1983 OCLC filed for copyright of its data base as a compilation. The Library of Congress eventually registered the copyright, but specifically limited the registration to the online compilation only, and indicated that any competing copyright claims would also be registered. A number of OCLC-member libraries have since filed copyright claims as co-authors of the data base. The legality and extent of the copyright have not been determined and OCLC's actions in filing for the copyright have created much concern and dissent among OCLC-member libraries.
Further information obtained by our office will assist in understanding the nature of the records involved and how they come about.
The OCLC online data base contains approximately 12 million bibliographic title entries which contain the information one is accustomed to finding in a traditional card catalogue at the public library. Over fifty percent of these entries have been made by the *Page 135 
Library of Congress. All other entries have been made by OCLC-member libraries having access to the OCLC computer system. OCLC does not itself make entries.
When an OCLC member obtains a new title (i.e., book or other publication) for its collection, it checks, through its computer access to the OCLC data base, to determine whether the title and bibliographic information have been entered. If not yet entered, the library will enter the new title into the OCLC system. Along with traditional bibliographic information, it will state that the new title is held by the library. The next library making a similar inquiry of OCLC will find that the title has been entered and that it is available at the library that made the initial entry. The second library may then simply add its name to the record indicating that it too has the title in its holdings. This information would in turn be available to the next library that inquires about that title. In addition, a library with access to OCLC may modify the bibliographic record to conform to the library's particular format or needs. Any library entering a new title or making a modification or just adding its name to the list of holding libraries pays a prescribed fee to OCLC for the transaction.
An OCLC-member can obtain a computer tape of those titles or bibliographic records which it holds in its collection. However, as stated by your legal counsel:
 OCLC has a rather intricate pricing system it uses when a library requests a copy of the computer tape of its holdings. Besides paying for the tape itself and production costs, COWL also pays between $.013 and $.035 for each record on the tape, the price depending upon the number of records on the tape. For example, if a tape has less than 1,000 records, OCLC will charge $.035 per record; if a tape has more than 200,000 records, the charge will be $.013 per record. This means it is much more cost efficient for COWL to purchase one tape with the transactions of all Wisconsin libraries, than for each library to purchase its own tape individually. In Wisconsin, one of the uses being made of the OCLC tapes has been to create a database and microfiche system called WISCAT. WISCAT provides a list of bibliographic records and the holdings of all Wisconsin libraries (including non-OCLC members) by title, author and subject matter. Currently OCLC does not produce such a microfiche system or a *Page 136 
listing of holdings by subject matter. Consequently, WISCAT is not competing with OCLC in this regard.
 In order to create WISCAT, the DLS first purchases a tape copy of the transactions which Wisconsin libraries have entered into the OCLC data base. DLS also adds records from some local databases (which were developed before OCLC came into being) plus additional Library of Congress MARC records. DLS then sends these tapes to a private vendor, Brodart, for additional data processing. Brodart eliminates all duplicate entries, adds local and regional information to each record, adds an identifying number that is unique to Brodart, and then translates all of this information into microfiche cards. The data base which is used to produce the microfiche now contains nearly three (3) million bibliographic records and requires 3,600 microfiche cards. To reproduce this information into paper records would require over 720,000 sheets of paper and at $.15 per page would cost over $10,000.
(Haas letter of October 18, 1985, at 2.)
Your legal counsel has further advised me of your MITINET project:
 The other major Wisconsin project is MITINET. MITINET is a micro-computer program which can be used on IBM-PC or Apple computers to enter into a computer format the holdings records of a non-OCLC library. After a library has recorded its holdings information on a floppy disk, the disk is sent to DLS. DLS then sends the disks to the Madison Area Computer System at the UW-Madison to convert the disks into computer tapes. These tapes are then sent to Brodart which puts the records into Library of Congress/MARC format and then converts them into WISCAT microfiche records. The LC-MARC format used by MITINET is not the same as the OCLC-MARC format used by OCLC. MITINET permits smaller libraries, for which OCLC membership is not economically feasible, to include their local holdings records on the WISCAT database and microfiche. Until very recently OCLC did not produce a program such as MITINET. Consequently, although MITINET was in no way competitive with OCLC when it was introduced, OCLC now considers it to be a competitive product.
(Haas letter of October 18, 1985, at 3.) *Page 137 
Thus, a non-OCLC member that identifies its local holdings in this way can have the information merged into the WISCAT data base by Brodart. Then, the local library obtains a separate computer tape of all titles it holds from Brodart, usually ordered through DLS. The tape can be used for circulation purposes. The tape would also show other Wisconsin libraries holding the same title so it could also be used for interlibrary loans.
OCLC has undertaken to renegotiate contracts with its members to include provisions controlling the transfer of the OCLC data base to nonmembers. The proposal embraces the following principles among others, as stated by OCLC:
 A. Protection and enrichment of the OCLC database for the benefit of the OCLC membership, and the library world in general, is both necessary and desirable. Third Parties who receive copies of Records should normally reciprocate by making their records and holdings available to the OCLC database.
 B. Protection of the OCLC database is best achieved by means of specific language in contracts with users and with OCLC-affiliated networks.
 C. Contracts with Third Parties will normally provide for appropriate compensation to OCLC, financial or other, for the use of Records.
 D. In the absence of contract provisions governing transfers to and use by Third Parties, OCLC may seek to protect the OCLC database by means of its copyrights. OCLC will not invoke copyright against general members or networks with which contracts have been executed which include protective language dealing with the transfer of Records to Third Parties.
Principle D appears to give an OCLC member a choice — either agree to new contractual provisions controlling transfer to third parties or be exposed to copyright infringement actions. In essence, you ask whether the public records law precludes DPI from agreeing to a contractual provision that could serve to limit access to the computerized records.
As a general matter, computer tapes in the possession of a state agency are "records" as defined in section 19.32(2), Stats. Section *Page 138 19.36(4) expressly provides that material used as input for a computer program and material produced as a product are subject to inspection and copying, but that a computer program is not. However, section 19.32(2) further specifically provides that the term "record" does not include "materials to which access is limited by copyright, patent or bequest . . . ."
COPYRIGHT CLAIM
Because of the factual and legal complexity of this matter and the national scope of the controversy, I expect a final resolution of OCLC's copyright claim will come from the federal appellate courts. However, I can give you some legal principles to consider and my evaluation of the strength of the copyright claim given the facts as I understand them.
 While the Copyright Act of 1976, like the prior statute, was enacted to further the public interest and not the interests of those seeking to profit from their intellectual properties, it is premised on a recognition that creativity is fostered by affording protection against copying by others. "[T]he real purpose of the copyright scheme is to encourage works of the intellect, and . . . this purpose is to be achieved by reliance on the economic incentives granted to authors and inventors by the copyright scheme." Universal City Studios v. Sony Corp. of America, 659 F.2d 963, 965 (9th Cir. 1981). That protection extends beyond the copying of the literary work itself to appropriation by derivative works, such as the motion picture version of a copyrighted novel. 17 U.S.C. §§ 101 and 106. Copyright protection does not extend, however, "to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. § 102.
National Business Lists v. Dun Bradstreet, Inc., 552 F. Supp. 89,91-92 (N.D. Ill. E.D. 1982) (hereinafter cited as "D B").
Facts alone are not copyrightable. Rand McNally Co. v. FleetManagement Systems, 591 F. Supp. 726, 731 (N.D. Ill. E.D. 1983) (hereinafter "Rand McNally"). Neither are ideas or their use.Signo Trading Intern. Ltd. v. Gordon, 535 F. Supp. 362, 365 (N.D. Cal. 1981) (hereinafter "Signo"). However, the compilation of facts may be protected by copyright even though the facts themselves are in *Page 139 
the public domain. Schroeder v. William Morrow Co., 566 F.2d 3,5 (7th Cir. 1977).
The courts express some dismay that copyright protection is accorded to compilations. D B, 552 F. Supp. at 91-92; RandMcNally, 591 F. Supp. at 731. Compilations do not usually involve the sort of original, creative or intellectual works that fall more readily within the concept of copyright protection. As stated by the court in D B, 552 F. Supp. at 92:
 That protection does not fit nicely into the conceptual framework of copyright law and has for that reason been criticized. See 1 Nimmer on Copyright § 3.04 (1981). It has been suggested that the act of aggregating isolated pieces of information can be authorship, with the resulting collection of data being a work of authorship . . . . The courts have generally rested, however, not on an analysis of copyright concepts but on the economic incentives premise of the copyright law and the injustice of permitting one to appropriate the fruit of another's labor. . . . That concept of authorship is, moreover, supportable by the language of the Copyright Act of 1976, which defines compilations as "a work formed by the collection and assembling . . . of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship." 17 U.S.C. § 101 (emphasis supplied). And the protection of copyright extends to protection against derivative works, which include any form "in which a work may be recast, transformed, or adapted." 17 U.S.C. §§ 101 and 106. Finally, 17 U.S.C. § 103(b) distinguishes between material contributed by the author of a compilation and preexisting material, granting protection to the former but not to the latter.
Though protected, "compilations" are considered to be at the "outer boundaries of copyright law." D B, 552 F. Supp. at 91, 94.
Thus, the protection accorded compilations is based on the premise that the fruits of the compiler's labors should be protected from appropriation. D B, 552 F. Supp. at 92, 94. In the most recent case out of the Seventh Circuit Court of Appeals, the court rejects the importance of originality and focuses on the need for "industrious collection" and "substantial independent effort" on the part of the compiler. Schroeder, 566 F.2d at 5, 6. *Page 140 
Although OCLC's role can be seen as a collection activity, it may fall short of the kind of industrious and independent effort needed to establish protection. This is due to the fact that it is the OCLC-members, and not OCLC, who actually create the collection through their entries into the data base. It is the members who create, update and manipulate the data base.
Copyright in a compilation "extends only to the material contributed by the author." Rand McNally, 591 F. Supp. at 731; D B, 552 F. Supp. at 92. It does not include input from other sources. Rand McNally, 591 F. Supp. at 733. It may be that OCLC does not contribute any substantive material to the data base. It provides only a means of collection, storage and retrieval. Copyright protection is not affected by the fact that a computer is used. 17 U.S.C. § 117 (1977). In my view, this mere "mechanism" for compilation is not protected by the copyright laws.
FAIR USE
If it is determined that OCLC has a compilation that is copyrightable to some extent, use of the compilation in the manner now in controversy may nevertheless be defensible against a claim of copyright infringement based on the defense of "fair use."
The doctrine of "fair use" is codified in 17 U.S.C. § 107
(1977), which reads:
Limitations on exclusive rights: Fair use
 Notwithstanding the provisions of section 106, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include —
 (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
(2) the nature of the copyrighted work;
 (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and *Page 141 
 (4) the effect of the use upon the potential market for or value of the copyrighted work.
The factors enumerated are not meant to be exclusive. Harper Row Publishers v. Nation Enterprises, 105 S.Ct. 2218, 2231
(1985).
The general intention behind the provision is as follows:
 General Intention Behind the Provision. The statement of the fair use doctrine in section 107 [this section] offers some guidance to users in determining when the principles of the doctrine apply. However, the endless variety of situations and combinations of circumstances that can rise in particular cases precludes the formulation of exact rules in the statute. The bill endorses the purpose and general scope of the judicial doctrine of fair use, but there is no disposition to freeze the doctrine in the statute, especially during a period of rapid technological change. Beyond a very broad statutory explanation of what fair use is and some of the criteria applicable to it, the courts must be free to adapt the doctrine to particular situations on a case-by-case basis. Section 107 [this section] is intended to restate the present judicial doctrine of fair use, not to change, narrow, or enlarge it in any way.
1976 U.S. Code Cong. Ad. News 5680.
1. Purpose and character of the use.
The controversial use here involves the extraction of bibliographic entries from the OCLC data base and through various stages and processes the production of an individualized computer tape that can be used by a local library in Wisconsin for its particular holdings and needs. The service provided by DPI is entirely nonprofit. Indeed, the service is subsidized to some extent by state funds. There is no commercial motive. The motivating purpose is to improve the state's library system. All these factors are strong indicators of"fair use."
2. The nature of the copyrighted work.
Assuming OCLC qualifies as a copyrightable compilation, it has already been noted that compilations exist at the fringe of the copyright laws. D B, 552 F. Supp. at 91. Also important is the fact that the critical input into the data base comes from and is really accomplished completely by the members, and OCLC provides only the mechanism. These factors indicate a lower form of copyright interest. *Page 142 
3. The relative amount of the portion used.
It is my understanding that the OCLC data base holds approximately 12 million titles and you extract about 2.6 million of those for the WISCAT data base for use in Wisconsin. When computer tapes are provided through DLS and Brodart for a local library, the number of titles ranges from 25,000 to 40,000 titles.
In Williams Wilkins Company v. United States, 487 F.2d 1345,aff., 420 U.S. 376 (1973), it was held that the absolute volume of copying is not decisive. Williams, 487 F.2d at 1355. There the National Institute of Health and the National Library of Medicine were copying 930,000 pages a year mainly from medical journals, but that volume did not preclude a decision that their use was a fair use.
In the instant situation a local library in Wisconsin is typically obtaining less than one-half percent of the total OCLC data base.
 4. Effect on market for or value of the copyrighted work.
The burden would be on OCLC to show some substantial injury flowing from DLS's use of the data base, and OCLC could not simply rely on the assumption that your service is depriving it of clients. Williams, 487 F.2d at 1358-59.
The court in Williams was not convinced that the suppression of copying would result in more sales by the publisher. There are other means, or one could simply go without. Williams,487 F.2d at 1359.
The same may be true here. If the local libraries cannot obtain computer tapes of their holdings from DLS, it may be very unlikely that they would be able to go to OCLC for the service. The result would be a return to the less efficient card catalog systems and interlibrary loan systems. The quality of the state's library system would suffer, and ultimately school children and others who rely on libraries would be deprived.
In addition to weighing the foregoing factors, the court inWilliams also took into account the fact that there was some question as to the legal basis for the infringement claim.Williams, 487 F.2d at 1359. That factor is present here as well, as discussed earlier. Another factor vitiating against OCLC is that it has acquiesced to this practice since its inception. If there is a market, DLS has created it. *Page 143 
In the end, one must balance the public interest to be served against the copyright interests to be protected. Williams,487 F.2d at 1359.
In Williams, the court decided that the risk to the plaintiff's business was unproven while there would be an obvious detrimental impact on medical science if copying of journal articles was suppressed. The court held the use to be a "fair use."
In the case before us, it appears equally true that suppression of established services to local libraries will have a detrimental effect on the state's library system without necessarily generating any benefit for OCLC. This, along with the fringe nature of OCLC's underlying copyright claim, lead me to believe that a reviewing court would hold your use to be a fair one.
COPYING COMPUTERIZED RECORDS
At the time when the only general statutory law on public records was section 19.21, the attorney general opined that there was a right to obtain a copy of computer tapes, including those containing computer programs. 59 Op. Att'y Gen. 144, 147 (1970); 63 Op. Att'y Gen. 303, 304 (1974). The question is whether the expanded codification of the public records law enacted by chapter 335, Laws of 1981, requires a change in that interpretation. It certainly does in part since section 19.36 (4) now provides that a computer program is not subject to examination and copying. However, the new statutes do not prohibit the copying of computer tapes. Indeed section 19.36(4) affirmatively provides that the data base and "product of the computer program," which could be a computer tape, are subject to copying. If this were the end of section 19.36(4), I would say the law as expressed by the earlier opinions of this office with respect to computer tapes remains unchanged. That is, there is a right to copy a computer tape under the public records law.
However, further analysis is necessary because section 19.36(4) says it is subject to exceptions in section 19.35. Section19.35(1)(a) carries over any common law principles. Section19.35(1)(c) and (d) specifically authorize the copying of audio tapes and video tapes, and there is no specific authorization for copying of computer tapes. It may be argued this omission constitutes an implicit exception. But I do not believe this to be the legislative intention. In my opinion, there need be no specific authorization in section 19.35(1) *Page 144 
to copy a computer tape, because sections 19.36(4) and 19.21, as previously interpreted, authorize copies of computer tapes.
Section 19.35(1)(e) reads as follows: "Except as otherwise provided by law, any requester has a right to receive from an authority having custody of a record which is not in a readily comprehensible form a copy of the information contained in the record assembled and reduced to written form on paper." It appears from the drafting files in the Legislative Reference Bureau that the drafters had computerized information in mind when they drafted this paragraph. The language first appeared in the drafts that became Assembly Substitute Amendment 1 to 1981 Senate Bill 250, and the initial drafting instructions (LRB S 0810) included the following notation for section 19.35(1): "Computer (right to demand transcription)." Again, it may be argued that by specifically authorizing a copy of computerized information in written form, i.e., a printout, the Legislature intended to prohibit copying of the computer tape that holds the information. Again, it is my opinion that such an exception by implication is not necessary or compelling and should not be found to overcome the affirmative provisions of sections19.35(1)(a), 19.36(4) and 19.21, as previously interpreted.
If the Legislature had intended to preclude the copying of computer tapes it would have said so in section 19.36(4), where it expressly precludes the copying of computer programs. This is especially so since it specifically included "computer tapes" in the definition of a record in section 19.32(2).
It is well to note that statutory exceptions due to silence and implication are based on the general rule of statutory construction expressio unius est exclusio alterius which provides that the express mention of one matter excludes other similar matters not mentioned. Teamsters Union Local 695 v. WaukeshaCounty, 57 Wis.2d 62, 67, 203 N.W.2d 707 (1973). But our supreme court has cautioned against its use:
 Although based upon logic and the working of the human mind, it is not a "Procrustean standard to which all statutory language must be made to conform." . . . Factually, there should be some evidence the legislature intended its application lest it prevail as a rule of construction despite the reason for and the spirit of the enactment. *Page 145 
Columbia Hospital Asso. v. Milwaukee, 35 Wis.2d 660, 669,151 N.W.2d 750 (1967).
In my opinion, section 19.35(1)(e) is intended to be supplemental. It makes clear that a requester may have computerized data reduced to written form if the data is otherwise not comprehensible to the requester. However, if a computer tape is comprehensible to the requester because the requester has a machine that can read a computer tape, it is my opinion the requester may obtain a copy of the computer tape. Indeed, in some cases I would expect that the computerized record would be meaningful and manageable only through access to the computer tape, and that a printout would be worthless.
Therefore, it is my opinion that any agreement to refuse to provide copies of computer tapes, other than those containing computer programs, would be inconsistent with the state's public records law.
BCL: RWL *Page 146