TRIANGLE PUBLICATIONS, Inc., et al. v. NEW ENGLAND NEWSPAPER PUB. CO. et al.

Civ. No. 1911.

District Court, D. Massachusetts.

July 8, 1942.

· Joseph N. Welch, David Burstein, and
Hale & Dorr, all of Boston, Mass., and

200

Robert M. Green, Harold E. Kohn, and Murdoch, Paxson, Kalish & Green, all of Philadelphia, Pa., for plaintiff.

Henry M. Leen, John F. Rich, and Burns & Brandon, all of Boston, Mass., for defendant.

WYZANSKI, District Judge.

In view of the detailed findings and conclusions filed in this case, this opinion deals only with those questions of the law of copyright infringement and unfair competition that may be of general interest.

Plaintiffs publish throughout the nation daily and monthly periodicals specializing in news and information about race horses. In Massachusetts they compete with defendants who publish daily newspapers of general circulation that incidentally carry information about race horses.

Plaintiffs' daily periodicals carry "race result charts" for every race run on the previous day on each licensed track in North America, and also carry for every horse scheduled to run the next day a "past performance" table. A race result chart shows, with respect to a race already run, these among other facts: the track where the race was run; the condition of the track; the distance; the horses racing; the weights they carried; the jockeys; the post position of the horses; their relative position at the start of the race, at the finish and at four intermediate stages of the race; the distances separating the horses at the six stages of the race; the time of the race; and several staccato sentences commenting in race track parlance on the showing of the horses in that race. A past performance table shows with respect to a horse scheduled to run, these among other facts: when the horse last raced, where, the distance, the condition of the track that day, the winner's time, the type of race, the purse, his relative place at half a dozen stages of the race, his jockey, his equipment, the weight he carried, the odds, the names of the best performers in that race and a one or two word summation of this particular horse's form in that race.

Plaintiffs' monthly periodicals carry, not past performance tables, but an accumulation of all the race result charts for the previous month, together with an index of horses. The index shows on which of plaintiffs' charts during the current year each horse's name appears.

Plaintiffs secure information for all their periodicals through their own representatives stationed at every licensed track in North America. These representatives work in crews, some "calling" their observations of the race as it occurs to others who record upon charts the information as it is called out. In gathering the news plaintiffs spend more than half a million dollars annually. To secure a copyright on all their publications plaintiffs take the appropriate mechanical steps such as affixing a notice and making deposits with the Register of Copyrights.

Defendants do not compile any race result charts of their own. Under license, they publish the race result charts of the Associated Press and, for New England tracks only, the race result charts of plaintiffs. In publishing the charts of others, defendants carry their copyright lines.

In 1939 and 1940 defendants published in narrative form so-called "Last Performances" of race horses. In a typical case defendants stated of the horse "Sheknows" that the horse "May be the right one here. Finished third behind Paul Lee and Rafter in recent sprint outing at Tropical Park, December 27, in slop. Was piloted by Jockey Don Meade in that start but was no match for the top two. Following but creditable fifth in prior sprint test at same meeting, December 23, in a heat which was won by Sun Antioch". During the years 1939 and 1940 defendants secured their information of past races almost exclusively from race result charts in plaintiffs' monthly periodicals.

After April 20, 1941 defendants abandoned narrative accounts and thereafter published in tabular form so-called "Past Performances" of race horses. Defendants' tabular past performances were similar to, but more abbreviated than, the plaintiffs'. The principal items omitted are the relative positions of the horses at the post, at the quarter mile, at the half mile, at the three quarter mile and in the stretch and the distances between the horses at each stage of the race, including the finish. During the period since April 20, 1941 defendants procured the preponderant part of their data on past races from Associated Press charts, from programs published by tracks and from their own personal representatives at tracks; but on what I have found to be an excessive number of occasions, defendants filled in their so-called

past performance lines from race result charts in plaintiffs' monthly or perhaps daily periodicals which were not included in their license.

Of the issues of law raised, the most important are three: (1) are the periodicals of plaintiffs "writings of an author" within Section 4 of the Copyright Act of March 4, 1909, 35 Stat. 1075, 1076, U.S.C.A. T. 17, § 4 so as to be subject to copyright; (2) did defendants infringe plaintiffs' copyrights; and (3) was defendants' conduct unfair competition?

A single daily race chart viewed in isolation would be subject to copyright only in part. The whole could not be regarded as copyrightable as a compilation under Section 6 of the Copyright Act, 35 Stat. 1077, U.S.C.A. T. 17, § 6, because the arrangement includes only about a hundred items with reference to a single event that takes less than two minutes to observe and record, and the majority of those items could be collected without labor, skill or judgment by any spectator. To constitute a copyrightable compilation, a compendium must ordinarily result from the labor of assembling, connecting and categorizing disparate facts which in nature occurred in isolation. A compilation, in short, is a synthesis. It is rare indeed that an analysis of any one actual occurrence could be regarded as a compilation. For an account of a single event to be subject to copyright, it must have individuality of expression or must reflect peculiar skill and judgment.

It, therefore, becomes necessary to consider the parts of a single daily race result chart to see which parts are copyrightable. Those which are copied from the race track program or from public bulletin boards are not separately copyrightable, both because they are themselves copied (see Baker v. Selden, 101 U.S. 99, 102, 25 L.Ed. 841) and because they are depersonalized records or news of a single event which any observer could have recorded. International News Service v. Associated Press, 248 U.S. 215, 234, 39 S.Ct. 68, 63 L.Ed. 211, 2 A.L.R. 293; Collins v. Metro-Goldwyn P. Corp., 2 Cir., 106 F. 2d 83, 86; National Tel. News Co. v. Western Union Tel. Co., 7 Cir., 119 F. 294, 60 L.R.A. 805; Clayton v. Stone, C.C.S.D.N. Y., Fed.Cas.No. 2,872; Springfield v. Thame, [1903] 89 Law Times 242 (Ch.Div.).

On the other hand, there may be a separate copyright on those parts of a single chart which could not be observed and recorded by one person but which require the combined skill, judgment and effort of several highly trained persons working in unison. Cf. Patterson D. J. in Daily Racing Form Pub. Co. v. Cosmopolitan Press, S.D.N.Y.1934[1]. See dictum by Lord Wright in Odhams Press Ltd. v. London & Provincial Sporting News Agency (1929) Ltd., [1936] 1 Ch. 357, 364. See, apparently contra, the order of Mack, C. J., in Regal Press Inc. v. Tru-Sport Pub. Co. Inc., S.D.N.Y.1935.[1] That means there may be a copyright, even in the case of a single chart, upon so much of the writing as shows the position of the horses at the start of the race, the position of the horses at intermediate stages of the race, the position at the finish of those horses whose finish is not shown on the public board and the distance between the horses at all stages of the race. There may also be a copyright on the index number of the chart and on the staccato sentences or narrative chart comment, since the former is an original contribution, Cf. Bleistein v. Donaldson Lithographing Co., 188 U.S. 239, 251, 23 S.Ct. 298, 47 L.Ed. 460, and the latter may pass for an original description, which it hardly lies in the mouths of lawyers or judges to disparage on the ground it is nothing but a hackneyed arrangement of technical jargon. Chicago Record-Herald Co. v. Tribune Ass'n, 7 Cir., 275 F. 797; Henderson v. Tompkins, C.C.D.Mass., 60 F. 758; Walter v. Steinkopff [1892] 3 Ch. 489.

Although the individual race charts looked at separately are subject to protection only in part under the Copyright Law, the arrangement to be found in each issue of plaintiffs' daily publications, Daily Racing Form and The Morning Telegraph, of charts for all races run anywhere in North America during the previous day, together with past performance tables for all horses scheduled to run anywhere in North America during the day of publication, together with miscellaneous information about race horses and an index, is a compilation under Section 6 of the Copyright Act, 35 Stat. 1077, U.S.C.A. T. 17, § 6, and is copyrightable. Daily Racing Form Publishing Co. v. Cosmopolitan Press Inc., S.D.N.Y., 1934, Patterson D. J.,[1] (race results); Cal-

---

[1] No opinion for publication.

laghan v. Myers, 128 U.S. 617, 9 S.Ct. 177, 32 L.Ed. 547 (headnotes and indices of law reports); Jewelers' Circular Pub. Co. v. Keystone Pub. Co., 2 Cir., 281 F. 83, 26 A.L.R. 571 (directory of the jewelry trade); Egbert v. Greenberg, C.C.N.D.Cal., 100 F. 447, 448, 449 (official form charts); American Trotting Register Ass'n v. Gocher, C.C. N.D.Ohio, 70 F. 237 (Wallace's Year Books); Weatherby & Sons v. International Horse Agency & Exch. Ltd. (1910) 2 Ch. 297, 304 (stud books of brood mares); Mander v. O'Brien (1934) State Reports South Australia, 87, 92 (race track programs); Canterbury Park Race Course Co. v. Hopkins (1932) 49 Weekly Notes, New South Wales 27 (race track programs). The copyright covers the whole compilation. Even if a particular fact or sentence in that compilation has previously been copyrighted (as, for example, a description of a particular race), the new copyright on that compilation of race charts, past performance tables and the like covers that fact or sentence to the same extent as, and no more than, it covers any other fact or sentence in the compilation. That is, the new copyright covers the new pattern as such, including new threads, old threads, threads of fact from the public domain, and threads of copyrighted material. But the new copyright on the compilation, of course, does not extend the old copyright theretofore secured on any writing which contributes to the new pattern. Section 6 of the Copyright Act of March 4, 1909, 35 Stat. 1077, U.S. C.A. T. 17, § 6.

The reasons for holding the daily periodicals of plaintiffs copyrightable apply a fortiori to the monthly periodicals. The indices are clearly copyrightable. They are in the same classification as street directories, telephone books, railroad time-tables and headnotes for law cases. Callaghan v. Myers, supra; Sampson & Murdock Co. v. Seaver-Radford Co., 1 Cir., 140 F. 539, 542; Leon v. Pacific Tel. & Tel. Co., 9 Cir., 91 F.2d 484. As to the charts the question is closer. It may be that if a group of charts had already appeared in the daily periodicals and those charts had been copyrighted at that time, the new copyright on the monthly periodicals could not apply to those charts. See Section 6 of the Copyright Act of March 4, 1909, 35 Stat. 1077, U.S.C.A. T. 17, § 6. An author of a street directory for South Boston could not by incorporating his material in a new street directory covering all of Boston prolong the

protection for his earlier work of compilation. It is unnecessary, however, for me specifically to adjudicate this point, for plaintiffs have certificates of copyright for the group of charts as they appeared in the daily periodicals as well as certificates of copyright for the monthly periodicals. Thus, in any event, they have a standing to complain of a copying of the charts.

In 1939 and in 1940 defendants read the symbols, mathematical notations and cryptic expressions in plaintiffs' race result charts and then stated the same information in equivalent words. That was an infringement. Copying need not be in ipsissima verba. Kalem Co. v. Harper Bros., 222 U.S. 55, 60, 62, 32 S.Ct. 20, 56 L. Ed. 92, Ann.Cas.1913A, 1285 (motion picture of Ben Hur held to infringe the novel of the same name). Soule's Dictionary of English Synonymes is not a licensed sanctuary for literary pirates.

After 1941 defendants also infringed on the occasions when they copied directly into their past performance lines the symbols, notations and cryptic expressions shown in plaintiffs' charts. As my findings state, the infringements went beyond a reasonable and fair use of another's compilation, and therefore, unlike Dun v. Lumbermen's Credit Ass'n, 209 U.S. 20, 28 S.Ct. 335, 52 L.Ed. 663, 14 Ann.Cas. 501, warrant a decree restraining the defendants from further infringements. On the other hand, the plaintiffs seem to have exaggerated the number of·recent infringements (Ex. MM), and have overlooked the fact that old infringements rapidly lose potency (fdgs. 53, 72). Therefore, I shall not prior to the master's report enjoin the defendants from using any of the material they now have set up in type. To do so would be to succumb to the exaggerations and suspicions characteristic of a journalistic battle. To an American newspaperman meiosis remains a foreign word.

There is left for consideration the difficult question whether defendants infringed plaintiffs' copyrights when they used (if they did use) the indices and charts in plaintiffs' monthly periodicals solely to find a clue as to where and when a horse raced, and then used that clue for the purpose of locating, and copying from, defendants' own material on race results. It seems to me that in such a situation there is nothing which properly can be called copying. Dun v. Lumbermen's Credit Ass'n, 209 U.S. 20, 21, 28 S.Ct. 335, 52 L.Ed. 663, 14

Ann.Cas. 501; Edward Thompson Co. v. American Law Book Co., 2 Cir., 122 F. 922, 923, 62 L.R.A. 607; West Publishing Co. v. Edward Thompson Co., 2 Cir., 176 F. 833, 838; see foot note 12 in the opinion of Brandeis, J., in International News Service v. Associated Press, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211, 2 A.L.R. 293. None of plaintiffs' work is reproduced or cribbed. To be sure, defendants, by using plaintiffs' indices and charts, get the benefit of their competitors' labor and shorten their own. Yet this, as Dun's case shows, is not infringement, and plaintiffs' complaint, if well founded, sounds in tort on a count for unfair competition.

In considering the question of unfair competition, I must apply the law which the Massachusetts state courts would apply. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 14 A. L.R. 1487; Fashion Originators' Guild v. Federal Trade Commission, 312 U.S. 457, 468, 668, 61 S.Ct. 703, 85 L.Ed. 949, including their rules of conflict of laws, Klaxon Co. v. Stentor Co., 313 U.S. 487, 496, 61 S. Ct. 1020, 85 L.Ed. 1477. In view of the fact that defendants prepared all their material in Massachusetts and the further fact that the greater part of the competition between defendants and plaintiffs occurred in Massachusetts, I should suppose that the Massachusetts state courts would apply only the Massachusetts law of unfair competition. Even if some part of defendants' papers were sold in other states (which is not clear on the evidence), the Massachusetts courts, in determining issues of damages, would probably not apply to such sales the rules of unfair competition prevailing in these states. And certainly the Massachusetts courts, and a fortiori this court, in considering whether to issue an injunction would be guided solely by Massachusetts rules of unfair competition, and would ignore the rules of unfair competition prevailing elsewhere. R. C. A. Mfg. Co. v. Whiteman, 2 Cir., 114 F.2d 86, 89, col. 2.

The courts of Massachusetts, perhaps mindful of the views held by the Massachusetts brethren on the Supreme Court of the United States, perhaps from their general hostility to new trends in the law of torts, and perhaps observing that the federal courts now seem to feel Mr. Justice Pitney's dicta went too far in International News Service v. Associated Press, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211, 2 A.L.R. 293 (Cheney Bros. v. Doris Silk Corp., 2 Cir.,

35 F.2d 279, 281; R. C. A. Mfg. Co. v. Whiteman, supra, 114 F.2d at page 90; cf. Fashion Originators' Guild v. Federal Trade Commission, 312 U.S. at page 468, 61 S.Ct. 703, 85 L.Ed. 949) have never followed the implications which the bar sought to derive from the International News case. Except where there has been a breach of trust or contract (See F. W. Dodge Co. v. Construction Information Co., 183 Mass. 62, 66 N.E. 204, 60 L.R.A. 810, 97 Am.St.Rep. 412, as explained by Holmes J. in Chicago Bd. of Trade v. Christie Grain & Stock Co., 198 U. S. 236, 251, 25 S.Ct. 637, 49 L.Ed. 1031, by Brandeis, J., in International News Service v. Associated Press, 248 U.S. 215, 252, 39 S.Ct. 68, 63 L.Ed. 211, 2 A.L.R. 293, footnote 3, and by L. Hand, J., in Cheney Bros. v. Doris Silk Corp., supra, 35 F.2d at pages 280, 281) it is not unfair competition in Massachusetts to use information assembled by a competitor. Sallinger v. Conrad & Co., 242 Mass. 58, 61, 136 N.E. 79, teaches that lesson emphatically, if succinctly. In characteristic manner we are told that the International News case is distinguishable,— a familiar Massachusetts formula for declining to follow a foreign authority which, until the court spoke, seemed apposite. Other Massachusetts decisions confirm the tendency to limit the tort of unfair competition to cases of passing off one's own goods as those of a competitor, California Wine & Liquor Corp. v. Wm. Zakon & Sons, Inc., 297 Mass. 373, 378, 8 N.E.2d 812, and to deny relief in other cases where a defendant is taking what some commentators call a free ride at a plaintiff's expense, Flagg Mfg. Co. v. Holway, 178 Mass. 83, 59 N.E. 667; Bancroft v. Cook, 264 Mass. 343, 353, 162 N.E. 691; New Method Die & Cut-Out Co. v. Milton Bradley Co. et al., 289 Mass. 277, 283, 194 N.E. 80.

Even if it were to be supposed that the Massachusetts courts would follow the Supreme Court of the United States on the precise facts of International News Service v. Associated Press, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211, 2 A.L.R. 293, I believe that that concession would not help plaintiffs in this case, despite what appear to be the contrary views of Judge Patterson in Daily Racing Form v. Cosmopolitan Press and Judge Mack in Regal Press Inc. v. Tru-Sport Pub. Co., both supra. In the International News case the defendant used the plaintiff's material in virtually the form plaintiff displayed it; here defendants use plaintiffs' indices and charts of races, not

204

to repeat them but, to prepare tables showing the past performances of horses. In the International News· case, [at least Holmes and McKenna JJ. thought (page 246 of 248 U.S., 39 S.Ct. 68, 63 L.Ed. 211, 2 A.L.R. 293) that] the defendant was representing to the public that it had acquired the news; here defendants' past performance tables in no way represent that the information on which the tables were based was derived from their own charts and indices. In the International News case the defendant was restrained for a limited number of hours (page 246 of 248 U.S., 39 S.Ct. 68, 63 L.Ed. 211, 2 A.L.R. 293); here plaintiffs seek a restraint presumably for the racing life of a horse. Furthermore, it is to be noted that in the International News case it was not held to be unfair competition for one news agency to use the news published by another agency as a "tip" to be independently investigated (pages 243–245 of 248 U.S., 39 S.Ct. 68, 63 L.Ed. 211, 2 A.L.R. 293). In the case at bar if defendants used plaintiffs' indices to get clues to defendants' own material, that practice much resembles the use by one news agency of tips gathered from a rival and used for independent investigation.

Moreover, if it were to be supposed that the Massachusetts courts are silent on the precise problem here raised, and I have been left unfettered by a local chain of cases, I could hardly be unmindful of the probability that a majority of the present justices of the Supreme Court of the United States would follow the dissenting opinion of Mr. Justice Brandeis in the International News case, page 248 of 248 U.S., 39 S.Ct. 68, 63 L.Ed. 211, 2 A.L.R. 293, because they share his view that monopolies should not be readily extended, and his faith that legislative remedies are to be preferred to judicial innovations for problems where adjustment of many competing interests is necessary.

■ But though defendants' use of plaintiffs' indices and charts solely for the purpose of securing clues as to where horses previously ran seems to me to be neither an infringement of copyright nor, under the law of Massachusetts, unfair competition, the decree which I have drawn nonetheless enjoins that use. I am persuaded that in view of defendants' prior record of infringement of plaintiffs' publications it would be unsound to allow defendants an exception from the injunction so that they might use plaintiffs' books for the limited purpose of getting clues to defendants' own material. Such an exception would make the injunction in practice unenforceable. In effect, it would place upon their honor defendants who necessarily rely upon minor sports writers chosen for qualities other than their capacity to make nice discriminations respecting the law of literary property.

Decree for plaintiffs in accordance with opinion.