**FINANCIAL INFORMATION, INC., Plaintiff,**

v.

**MOODY'S INVESTORS SERVICE, INC., Defendant.**

**No. 81 Civ. 6001 (RLC).**

United States District Court, S.D. New York.

May 23, 1983.

Lieberman, Rudolph & Nowak, New York City, for plaintiff; David A. Kalow, New York City, of counsel.

Satterlee & Stephens, New York City, for defendant; Robert M. Callagy, New York City, of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

This is a copyright action in which the plaintiff, Financial Information, Inc. ("FII"), charges the defendant, Moody's Investors Service, Inc. ("Moody's"), with copying the information that FII gathers and publishes each day on bonds called for redemption.[1] Moody's has moved for summary judgment pursuant to Rule 56, F.R. Civ.P., alleging, first, that the daily bond data that FII publishes are individual facts and therefore not copyrightable as compilations and, second, that FII has not registered its daily called bond service with the United States Copyright Office.[2]

FII, a publisher of financial information incorporated and with its principal place of business in New Jersey, distributes a daily called bond service to subscribers. Sheekey Aff. ¶ 2. As part of this service, FII sends its subscribers notices, in the form of index cards, of approximately ten called bonds each business day. Id. On each card, FII publishes the name of the issuer of the bond, the type and interest rate of the bond, the redemption price, the redemption date, the redemption agent, and the serial numbers of the bonds called. Exh. 1 to Complaint. At the end of each year, FII publishes a cumulative volume of these called bonds by editing, alphabetizing and pasting together the index cards for each year. Sheekey Aff. ¶ 2.

Moody's, a Delaware corporation with its principal place of business in New York, is also a financial publisher. Complaint ¶¶ 2, 10. Among defendant's publications is its *Municipal & Government Manual*, which contains, *inter alia*, listings of bonds called for redemption. Callagy Aff. ¶ 3. Moody's supplements this manual with semiweekly fact sheets that contain updating informa-

tion about called bonds and other matters. *Id.*

FII and Moody's are clearly competitors, and Moody's subscribed to FII's called bond service until this action was brought on September 28, 1981. Sheekey Aff. ¶ 2.

When a municipality or other government body calls a bond for redemption, it publishes a notice of the call in one or more newspapers. *Id.* ¶ 3. Since all such notices are not published in a single place or journal and since issuers stop paying interest on bonds after the redemption date, financial institutions, which are ill-equipped to keep track of the thousands of call notices each year, subscribe to called bond services. These services keep tabs on and report all relevant calls. *Id.*

FII asserts that it undertakes considerable effort and expense in collecting, assembling and rewriting its notices on called bonds. Sheekey Aff. ¶ 4. FII says it obtains call information by subscribing to many newspapers and financial publications around the country, by placing itself on the mailing lists of many issuers and redemption agents and by following up reported calls by telephone and through correspondence. *Id.* According to FII, its personnel regularly check public notices and advertisements in at least 20 publications, including the Bond Buyer, the Boston Herald American, the Toronto Globe, the Lake Tahoe News, the Pittsburgh Post Gazette, and the New Orleans Times Picayune. Exh. D to Callagy Aff. Although FII has not stated how much it spends collecting call information, it says a subscription to its daily called bond service costs almost $300 per year. Sheekey Aff. ¶ 4.

FII asserts that since 1974, defendant's *Municipal & Government Manual*, rather than obtaining its call information by perusing newspapers, financial publications and municipalities' mailed announcements, has simply copied its call notices from FII's

---

**1.** The court has jurisdiction of this action pursuant to 28 U.S.C. § 1338(a).

**2.** FII has also brought a claim of unfair competition against Moody's pursuant to 28 U.S.C. § 1338(b). Complaint ¶¶ 22–28.

daily cards. Complaint ¶ 13. In 1980, when FII first suspected that Moody's was copying FII's data on called bonds, FII inserted intentional errors into its daily cards. *Id.* ¶ 14. Moody's evidently copied FII's deliberate errors. Exh. 1 to Complaint. FII next checked to see whether Moody's had copied accidental errors that had appeared in its daily cards, and FII discovered that Moody's had copied such accidental errors since 1974. Complaint ¶ 16. A mathematician hired by FII estimated that the eight instances in which FII found that Moody's had reproduced its errors indicated that at least 50 percent of the municipal and government bond information published by Moody's was copied from FII's bond service. Robbins Aff. ¶¶ 5–6.[3]

All of FII's daily call cards carry a notice of copyright. Complaint ¶ 17. FII says that it has registered its yearly compilations with the Copyright Office, *id.* ¶ 18, and asserts that the certificates of registration that it has received cover not only the annual volumes, but also each day's cards, which are ultimately incorporated into the cumulative volumes. While acknowledging that the annual compilations were registered, Moody's notes that FII never registered its daily cards with the Copyright Office. Callagy Aff. ¶ 9. It maintains that because this is so and because, in its view, the certificates for the annual volumes do not cover the cards published each day, the daily cards are not protected by the copyright laws. Furthermore, Moody's argues that the daily cards are not copyrightable.

## DETERMINATION

Moody's makes two basic arguments why in its view the called bond data that FII publishes each day cannot receive copyright protection: first, that the daily data are facts and therefore not copyrightable and, second, that the daily data are not compilations and are therefore not copyrightable as such.

Moody's is certainly correct in maintaining that facts are not copyrightable. *See, e.g., Miller v. Universal City Studios, Inc.,* 650 F.2d 1365, 1368 (5th Cir.1981); *Hoehling v. Universal City Studios, Inc.,* 618 F.2d 972, 974, 979 (2d Cir.), *cert. denied,* 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980); *Rosemont Enterprises, Inc. v. Random House, Inc.,* 366 F.2d 303, 309 (2d Cir.1966), *cert. denied,* 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967). In *Hoehling,* the Second Circuit rejected the appeal of the author of a history about the Hindenberg dirigible who asserted that his copyright was infringed by a television studio that used his book as one of its historical sources in making a show about the dirigible. Judge Kaufman wrote that "factual information is in the public domain[,]" 618 F.2d at 979, and that "the protection afforded the copyright holder has never extended to history, be it documented fact or explanatory hypothesis." *Id.* at 974. What is of course protected is "the author's original expression of particular facts." *Id.*

While facts have not been given copyright protection, compilations of such facts traditionally have been. *See, e.g., Schroeder v. William Morrow & Co.,* 566 F.2d 3 (7th Cir.1977) (directory of nurseries); *Leon v. Pacific Telephone & Telegraph Co.,* 91 F.2d 484 (9th Cir.1937) (telephone directory); *Jeweler's Circular Publishing Co. v. Keystone Publishing Co.,* 281 F. 83 (2d Cir.), *cert. denied,* 259 U.S. 581, 42 S.Ct. 464, 66 L.Ed. 1074 (1922) (jeweler's directory); *List Publishing Co. v. Keller,* 30 F. 772 (C.C.S.D.N.Y.1887) (social register); *see also* 1 *Nimmer on Copyright* § 2.04[B] (1982). In a landmark copyright case, the Second Circuit succinctly stated the rule:

---

**3.** It has long been recognized that "one of the most significant evidences of infringement [is] the copying of errors . . . ." *Callaghan v. Myers,* 128 U.S. 617, 662, 9 S.Ct. 177, 190, 32 L.Ed. 547 (1888); *accord Southwestern Bell Telephone Co.* *v. Nationwide Independent Directory Service, Inc.,* 371 F.Supp. 900, 906 (W.D.Ark.1974); *Sub-Contractors Register, Inc. v. McGovern's Contractors & Builders Manual, Inc.,* 69 F.Supp. 507, 510 (S.D.N.Y.1946) (Caffey, J.).

'A man's name, his occupation, his place of business, and his residence are none of them subjects of copyright.'

But, if a man compiles a book containing such information about the residents of a particular place, he may ... copyright it as a whole, notwithstanding the fact that the separate parts of which it is composed are not copyrightable.

*Jeweler's Circular Publishing Co., supra,* 281 F. at 87; *see also Schroeder v. William Morrow & Co., supra,* 566 F.2d at 5 ("An original compilation of names and addresses is copyrightable even though the individual names and addresses are in the public domain and not copyrightable"). Indeed, the Copyright Act of 1976 expressly provides for the protection of compilations, 17 U.S.C. § 103(a), which the Act defines as works

formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship.

17 U.S.C. § 101.

Thus, the pivotal question becomes whether FII's daily called bond data can be considered a compilation. Although it acknowledges that FII's annual volumes of called bond data are copyrightable compilations, Moody's asserts that the daily data are merely individual facts that cannot be considered compilations. Moody's argues that the ten or so index cards containing bond data that are published each day are not such a "collection and assembling of preexisting ... data ... that the resulting work as a whole constitutes an original work of authorship." 17 U.S.C. § 101. Moody's relies most heavily on *Triangle Publications, Inc. v. New England Newspaper Publishing Co.,* 46 F.Supp. 198 (D.Mass.1942), in which then District Judge Wyzanski stated:

To constitute a copyrightable compilation, a compendium must ordinarily result from the labor of assembling, connecting and categorizing disparate facts which in nature occurred in isolation. A compilation, in short, is a synthesis. It is rare indeed that an analysis of any one actual occurrence could be regarded as a compilation. For an account of a single event to be subject to copyright, it must have individuality of expression or must reflect peculiar skill and judgment.

*Id.* at 201. Defendant's argument is, in essence, that FII, in publishing its bond data index cards, records only public information about single public occurrences, i.e., bond calls, and does so without adding any "peculiar skill and judgment."

Moody's argument misses the mark, however. In publishing ten or twelve index cards each day, fifty or sixty each week, and some 2,500 in each year's cumulative volume, FII is unquestionably, to use Judge Wyzanski's words, "assembling, connecting and categorizing disparate facts which in nature occurred in isolation." *Id.* The FII employees who put together the daily called bond service assemble into one handy compilation disparate information about thousands of calls by hundreds of municipalities and other governmental entities in dozens of states. The principal thrust of the opinion in *Triangle Publications, Inc., supra,* was that information in a *single* daily race result chart which was gleaned from the official race track program or bulletin boards was not copyrightable, but when dozens or hundreds of such charts were assembled, the charts then constituted a compilation and all the information in them was protected from any copying that went beyond fair use.[4]

---

**4.** There is some dispute over how far subsequent compilers may go in relying on a prior compilation before they go beyond fair use. On one hand, there is the strict view: "'[I]t is safe to say that the compiler of a general directory is not at liberty to copy any part, however small, of a previous directory, to save himself the trouble of collecting the materials from original sources.'" *National Research Bureau, Inc. v. Kucker,* 481 F.Supp. 612, 615 (S.D.N.Y.1979) (Owen, J.), *quoting List Publishing Co. v. Keller,* 30 F. 772, 773 (C.C.S.D.N.Y.1887). At the same time, there is the recognition that "[b]ecause copyright protection for compilations of factual material cannot be reconciled with the general principles of the copyright laws, ... [a]uthors of

In amassing its bond data, FII is not just assembling a handful of statistics about a single, solitary occurrence, but is instead weaving together into a handy, coherent entity thousands of facts that "occurred in isolation." *Id.* Such a laborious, painstaking compilation is certainly the type that the copyright laws aim to protect. *Schroeder v. William Morrow & Co., supra,* 566 F.2d at 5–6; *Leon v. Pacific Telephone & Telegraph Co., supra,* 91 F.2d at 486; *Dow Jones & Co. v. Board of Trade,* 546 F.Supp. 113, 115 (S.D.N.Y.1982) (Carter, J.); *National Business Lists, Inc. v. Dun & Bradstreet, Inc.,* 552 F.Supp. 89, 94–95 (N.D.Ill.1982);[5] *see also Jeweler's Circular Publishing Co., supra,* 281 F. at 88 ("The man who goes through the streets of a town and puts down the names of each of the inhabitants, with their occupations and their street number, acquires material of which he is the author. He produces by his labor a meritorious composition, in which he may obtain a copyright").

To accord copyright protection to the annual compilation but deny it to each daily component would negate the value of the protection accorded the yearly compilation. If a competitor were to be able to copy each day's quantum of FII's called bond cards with impunity, the copyright protection given to the annual volume would be rendered meaningless as to that copying competitor. In urging the court to regard each day's quantum of cards in isolation, unrelated to all the cards coming before and coming after, Moody's in effect invites the court to see only the individual points in a pointillist painting and to be blind to the overall design. The traditional notion of blind justice does not require the court to be so insensitive to reality.

Just as an annual aggregation of called bond data should be considered a compilation, so, too, should each serial ingredient—be it the quarterly, monthly, weekly, or daily component—be considered a species of compilation.[6] If a cumulative volume warrants copyright protection as a compilation, then so do the serial components that ultimately comprise the cumulative tome—so long as there is adequate copyright notice on each component. *Cf. Triangle Publications, Inc., supra,* 46 F.Supp. at 202 ("The copyright covers the whole compilation.... That is, [it] covers the new pattern as such, including new threads, old threads, threads of fact from the public domain, and threads of copyrighted material").

The court's holding that each installment of a compilation that appears in serial components deserves the protection of the copyright laws is buttressed by the underlying goals of those laws. "[T]he real purpose of the copyright scheme is to encourage works of the intellect, and ... this purpose is to be achieved by reliance

---

compilations ... must be held to grant broader licenses for subsequent use than persons whose work is truly creative." *Dow Jones & Co. v. Board of Trade,* 546 F.Supp. 113, 120 (S.D.N.Y. 1982) (Carter, J.), *citing New York Times Co. v. Roxbury Data Interface, Inc.,* 434 F.Supp. 217, 221 (D.N.J.1977).

What is undisputed, however, is that "[w]hat a subsequent compiler cannot do is copy from an already copyrighted directory and thereby save himself the labor and expense incurred by the prior compiler." *Southwestern Bell Telephone Co., supra,* 371 F.Supp. at 906, *citing Leon v. Pacific Telephone & Telegraph Co.,* 91 F.2d 484 (9th Cir.1937); *accord Northwestern Bell Telephone Co. v. Bedco,* 501 F.Supp. 299, 302 (D.Minn.1980). Although the Second Circuit has taken a liberal view regarding the extent to which a subsequent author may use facts and historical interpretations contained in the work of a prior author, it has stated that "[a] verbatim reproduction of another work, of course, even in the realm of nonfiction, is actionable as copyright infringement." *Hoehling v. Universal City Studios, Inc., supra,* 618 F.2d at 980.

5. Ironically, *National Business Lists* involved the defendant's parent corporation, Dun & Bradstreet, Inc., which charged in a counterclaim that National Business Lists had infringed a business directory that it had compiled.

6. In saying this, the court is not addressing the question whether a one time only assembling of ten called bond index cards on a given day—not part of a yearlong compilation of such cards—would constitute a copyrightable compilation. *Cf. Triangle Publications, Inc., supra,* 46 F.Supp. at 201. What the minimum amount of labor required is to put together a copyrightable compilation is a question left for another day.

on the economic incentives granted to authors and inventors by the copyright scheme." *Universal City Studios, Inc. v. Sony Corp. of America,* 659 F.2d 963, 965 (9th Cir.1981), *cert. granted,* 457 U.S. 1116, 102 S.Ct. 2926, 73 L.Ed.2d 1328 (1982). Although they are not classic works of the intellect, compilations are the products of painstaking industry that serve the needs of their readers, albeit in a way different from more creative copyrighted works. To deny copyright protection to FII's daily called bond service, even while preserving it for the annual cumulative volumes, would go a long way toward destroying FII's incentive to collect and assemble bond data in a speedy, systematic way for the convenience of its subscribers. Although according protection to compilations "does not fit nicely into the conceptual framework of copyright law," *National Business Lists, Inc., supra,* 552 F.Supp. at 92; *accord Miller v. Universal City Studios, Inc., supra,* 650 F.2d at 1369–70;[7] 1 *Nimmer on Copyright* § 3.04 (1982), such protection of the compiler's diligence is essential "because that is the only protection which is meaningful." *National Business Lists, supra,* 552 F.Supp. at 95; *see also* Denicola, *Copyright in Collections of Facts: A Theory for the Protection of*

*Nonfiction Literary Works,* 81 Columbia L.Rev. 516, 528–31 (1981). Such protection is no less necessary for the serial installments of a compilation than for the cumulative compilation.

Lastly, Moody's argues that FII's action should be dismissed on the ground that the plaintiff has not satisfied the requirements of 17 U.S.C. § 411, which states that "[n]o action for infringement of the copyright in any work shall be instituted until registration of the copyright claim has been made in accordance with this title." Moody's contends that the daily index cards should be treated as related, but nevertheless distinct, works and that each should have to be registered separately.

FII argues, however, that its registration of its annual compilations covers the individual cards and thus the cards need not be registered one by one. FII asserts that it was proper for it to register just its cumulative volumes on the ground that 17 U.S.C. § 408(b)(2) requires the registration of the "best edition" of a work, and, according to FII, the annual volume is the best edition. Furthermore, FII states that it would be extremely cumbersome and expensive for it to register 2,500 index cards each year. See H.R.Rep. No. 1476, 94th Cong., 1st

---

**7.** In *Miller,* there is a long dictum discussing the difficulty in reconciling some of the directory cases with the general rule that facts are not copyrightable. 650 F.2d at 1369–70. The *Miller* dictum concluded that "it may be better to recognize the directory cases as being in a category by themselves rather than to attempt to bring their result and rationale to bear on nondirectory cases[,]" and that "the rule is now well settled that [directories] can be copyrighted[.]" *Id.* at 1370.

The *Miller* court seemed to say that the copyright protection accorded directories and other compilations protects the compiler's selection of facts and arrangement of the facts, but not the compiler's industry. In other words, the *Miller* court apparently stated that the copyright laws will not protect a compiler against a subsequent compiler who copies or bodily appropriates the prior compiler's labor, but does so without copying his format or arrangement. This discussion inexplicably ignores the many cases that state that the industriousness and diligent application of the compiler, as distinct from his arrangement of the facts, deserve copyright protection. *Leon v. Pacific Telephone & Telegraph*

*Co., supra,* 91 F.2d at 485–87; *Jeweler's Circular Publishing Co., supra,* 281 F. at 87–88; *Southwestern Bell Telephone Co., supra,* 371 F.Supp. at 905–06; *Triangle Publications, Inc., supra,* 46 F.Supp. at 202; *see also Dow Jones & Co., supra,* 546 F.Supp. at 115; *National Business Lists, Inc., supra,* 552 F.Supp. at 95.

The court believes that the better rule is that copyright protection should be afforded the compiler's industry, even when his arrangement is not copied, because oftentimes that is the only way that protection will prove meaningful. *See Leon, supra,* 91 F.2d at 485–87; *National Business Lists, Inc., supra,* 552 F.Supp. at 95; *see also* Denicola, *Copyright in Collections of Facts, supra,* 81 Columbia L.Rev. at 528–31; Note, *The Denial of Copyright to an Author's Research,* 5 W.New.Eng.L.Rev. 103, 121 (1982) ("It is the very labor involved in collecting, organizing, and compiling facts for a compilation that must be protected.... Without ... protection, few would undertake to compile a directory or draw a map since the substantial labor necessary to complete the task might be sacrificed by the wholesale appropriation of the work by a copier").

Sess. 154 (1976), *reprinted in* 1976 U.S. Code Cong. & Ad.News 5659, 5770; S.Rep. No. 473, 94th Cong., 1st Sess. 136 (1976) ("the requirement for separate registrations where related works or parts of a work are published separately has created administrative problems and has resulted in unnecessary burdens and expenses on authors and other copyright owners").

The Copyright Act of 1976 authorizes the Register of Copyrights to allow a number of related works to be registered together as a group. 17 U.S.C. § 408(c)(1). At the time that this litigation was commenced, however, the Register had not implemented regulations allowing for such group registration. Exh. H to Defendant's Motion for Summary Judgment.

■ Inasmuch as the annual compilations are nothing more than the aggregation of the index cards, it is more appropriate to regard the cards as integral parts of the overall compilation than as distinct, but related works. Because this is so, the court holds that the registration of the annual compilations covers the integral parts of those compilations, i.e., the daily cards, and that it was proper for FII to register the cumulative volumes as the best editions of the aggregated cards.

■ That Moody's allegedly began infringing the daily cards before the annual volumes were registered need not delay us. This is so because so long as there was adequate notice, a copyright action may stand notwithstanding the plaintiff's failure to register its work until after infringement began. *Primcot Fabrics v. Kleinfab Corp.*, 368 F.Supp. 482, 485 (S.D.N.Y.1974) (Gurfein, J.). In the instant case, FII gave clear notice of copyright on each of its cards.

Even if the cards were to be viewed, in the alternative, as related works, the court would be reluctant to hold that FII had to register each card separately, first, because it would be unduly taxing on both FII and the Copyright Office for FII to make 2,500 registrations for 2,500 index cards each year and, second, because,

through no fault of FII's, the Register has still not issued regulations on group registration.

For the foregoing reasons, defendant's motion for summary judgment is denied.

IT IS SO ORDERED.