**RAND McNALLY & COMPANY, Plaintiff,**

v.

**FLEET MANAGEMENT SYSTEMS, INC., d/b/a Logistics Systems, Defendant.**

No. 80 C 4499.

United States District Court, N.D. Illinois, E.D.

July 25, 1984.

**934**

William A. Streff, Jr., Donald G. Kempf, Jr., Daniel W. Vittum, Jr., Avy H. Stein, Kirkland & Ellis, Chicago, Ill., for plaintiff.

Richard A. Zinner, Friedman & Atherton, Boston, Mass., for defendant.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge:

This copyright action is before the court on the renewed motion for partial summary judgment of plaintiff Rand McNally & Company ("Rand McNally"). In an opinion issued on December 31, 1983, the court had denied the motions for summary judgment of both Rand McNally and defendant Fleet Management Systems, Inc. ("Logistics Systems"). Rand McNally filed a renewed motion for partial summary judgment. The court, having determined that the renewed motion presented new evidence and could help clarify and narrow issues for trial, ordered Logistics Systems to respond to the motion. For the reasons stated below, Rand McNally's renewed motion for partial summary judgment is granted in part and denied in part.[1]

### I. Existence and Ownership of Valid Copyright

#### A. Copyrightability of Data

In its December 31, 1983 opinion, the court noted that the maps were not the subject of Rand McNally's copyright claims. *Rand McNally & Co. v. Fleet Management Systems, Inc.*, 591 F.Supp. 726 at 737 (N.D.Ill.1983) ("Mem.Op. Dec. 31, 1983"). The court did note that Rand McNally was claiming infringement of the data contained throughout the *Mileage Guide*. However, in deciding the issues to be resolved in that motion, the court directed its attention not to the copyrightability and infringement of all the data on the maps, but to the data from the maps included on and organized in the mileage tables contained in the first part of the *Mileage Guide*. The mileage tables contain only the mileages among the key point cities.[2] Hence, the court's opinion did not

---

1. A general description of the facts and allegations of this case may be found in the court's December 31, 1983 opinion and will not be repeated here. "Mileage Guide" and "Guide" will be used to refer to the material for which protection is sought, namely, the *Standard Highway Mileage Guide*. The context will indicate when a particular edition is referred to. The court will refer to the parties' submissions by noting the parties' initials ("RM" or "LS") and whether the appendix was submitted with the renewed motion by adding "Ren."

2. Key point pair mileages are the hundreds of thousands of mileage figures representing distances between every pair of key point cities.

resolve the issues of copyrightability and infringement of the red and black segment mileages, as well as of the other information contained on the maps but not in the mileage tables. The copyrightability of these items will be considered here for the first time, and the copyrightability of the mileage tables will be considered in light of the exhibits and affidavits accompanying the parties' new submissions.

The court has already found that the *Mileage Guides* at issue in this action are "compilations" as defined by the Copyright Act of 1976. 17 U.S.C. § 103. (Mem.Op. Dec. 31, 1983 at 730–731.) In addition, the court has found that, while facts are generally denied copyright protection, compilations of facts under limited circumstances may receive such protection. (*Id.* at 731–733.) The Seventh Circuit has interpreted the copyright laws as protecting and encouraging the industrious compilation of facts.[3] This is true even where the facts compiled are collected from public domain sources. (Mem.Op. Dec. 31, 1983 at 731–732.) Logistics Systems' responding memorandum continues to assert its previously rejected argument that to be protected, mileages must have been measured and "discovered" by Rand McNally. While such determination of mileages would most certainly indicate that Rand McNally expended efforts protectible under copyright law, the collection of mileages already measured by others and injected into the public domain may also be protected.

The court was unable to determine whether the mileage table data was copyrightable for several reasons. First, Rand McNally's broad figures of the costs in updating the two *Mileage Guides* did not indicate to what extent the money was spent on obtaining and updating the data sought to be protected. Further, the court was unable to determine whether the effort in compiling the data itself was sufficient to merit protection. In part, this concern arose from the possibility that sources in the public domain, perhaps even earlier editions of Rand McNally's own *Guides*, provided the source of the data. Were the edition issued directly before the 1973 edition to contain a mileage table substantially similar to the 1978 and 1982 editions, Rand McNally's efforts in updating a compilation in the public domain could be small.[4] Rand McNally's renewed motion provides evidence supporting the conclusion that the mileage data in the 1978 and 1982 *Mileage Guides* could be validly copyrighted. The court, as discussed above, did not address the copyrightability of the various mileage values assigned to the red and black segments. The court will now address the copyrightability of the data in the *Mileage Guides.* Unless otherwise indicated, the court's factual discussion is derived from the undisputed summary judgment evidence and constitutes findings of fact. Citations to the record are provided for most factual conclusions.

### 1. Red and Black Segments

The mileages corresponding to the red and black segments on the maps indicate

---

Key point cities are those cities of most interest to the general public and shippers and carriers. Black mileage segments designate mileage distances between towns and junctions selected by Rand McNally. Red mileage segments designate mileages between selected points denoted by red stars. (A. Winterfeld Aff., RM App. A at ¶ 4.)

**3.** Additional authority for this proposition is found in *United States v. Hamilton,* 583 F.2d 448, 452 (9th Cir.1978). Law review commentary is also supportive of this rationale for protection. *See, e.g.,* Denicola, "Copyright in Collections of Facts: A Theory for the Protection of Nonfiction Literary Works," 81 *Colum.L.Rev.* 516 (1981).

**4.** That such a compilation may exist in the public domain alone will not make a compilation based upon it incapable of copyright protection. As the court has held, facts gleaned from public domain sources may be protected under limited circumstances. A public domain mileage compilation so out of date that to update it involves substantial effort and industry may be used as a source for an update compilation without preventing the new work from obtaining a valid copyright. As will be discussed below, Rand McNally has shown that revisions in the *Guide* even since 1973 have been substantial.

the road mileages between many more points than key point cities. It is undisputed that the mileages do not correspond to geographical mileages between various points, but attempt to correspond to distances as measured by roads in existence. Hence, the mileages change as the roads change.

The most important question in determining whether the segment mileage data is copyrightable concerns the effort involved in compiling that data. It is suggested that some of the data is derived from Rand McNally "field work." (A. Winterfeld Aff., RM App. A at ¶ 9.) Logistics Systems sharply disputes whether Rand McNally conducts field research in determining mileages, supporting its arguments with evidence from Rand McNally's own employee. (Pofahl Dep., LS App. B at 16–17, 20; A. Winterfeld Dep., LS App. D at Ex. 1.) (The court understands "field work" to constitute some physical measuring of the actual road in question.) For purposes of this motion, the court will accept as true that Rand McNally performs no field work when compiling the mileages in the *Mileage Guides.*

With this premise, it is clear that the mileages come from mileages measured by some third party. Rand McNally's evidence demonstrates that throughout the history of the *Mileage Guides,* this information was derived largely from public domain maps. It appears that Rand McNally has been publishing *Mileage Guides* (the 1982 *Guide* is the twelfth edition), since the 1930s. With each new edition of the *Mileage Guide,* more detailed mileage information is added. (*See* J. Ragsdell Aff., RM Ren.App. C.)[5] Additionally, each new edition corrects and updates the previous one.

Although Logistics Systems has argued that Rand McNally's culling of mileages from public domain maps is a small effort, it has not sought to argue that obtaining mileages from previous, uncopyrighted Rand McNally *Mileage Guides,* plus updating, renders insignificant the work on the subsequently copyrighted *Guides'* data. This was one of the court's concerns in noting previously that Rand McNally had submitted only the copyright certificates of the 1973, 1978, and 1982 *Guides.* For, apart from the various public domain source maps, it appears that the only public domain source for nationwide mileage data, especially concerning key point pair mileages, must come from the *Mileage Guides* themselves. Rand McNally's new evidence now convinces the court that the source of the 1978 and 1982 *Guides* is itself copyrighted, hence, even if revision of public domain mileage data cannot receive copyright protection, the data on which these two guides is based is copyrighted.

Rand McNally has submitted the copyright certificates for the 1962, 1966, and 1967 editions of the *Mileage Guide.* (RM Ren.App.E.) (Logistics Systems does not attack these certificates and they are presumptively valid.) Furthermore, the court has already found that Rand McNally has valid certificates of copyright registration over the 1973, 1978, and 1982 editions. Hence, if the mileage data in these editions is copyrightable, Rand McNally owns copyrights over it. For purposes of this motion, the court will assume that the *Guides* published before 1962 were not copyrighted.

The 1962 *Mileage Guide* incorporated several changes over the previous guides, largely because of changes in the United States road network resulting from the new interstate highway system. This

---

5. The court finds that the Ragsdell affidavit is competent evidence. The affidavit was based on Ragsdell's personal review of the records regarding Rand McNally's efforts in producing the *Mileage Guide.* (J. Ragsdell Aff., RM Ren. App. C at ¶ 1.) Such summaries are admissible under Fed.R.Ev. 1006. A very similar affidavit submitted in conjunction with a motion for summary judgment was upheld by the Seventh Circuit in *Case & Company, Inc. v. Board of*

*Trade of City of Chicago,* 523 F.2d 355, 360–61 (7th Cir.1975). The court noted that the party challenging the affidavit had ample opportunity to review the data on which the review was based and that ample discovery opportunities were provided. Logistics Systems does not claim that it was denied the means for disputing the affidavit, and in fact does not dispute the facts contained in the affidavit.

*Guide* was compiled from Rand McNally maps, but other sources were employed as well. County and city engineer maps (from city engineer departments), interstate highway plan sheets (from state highway departments), and information from other governmental and private (namely, state and city employees) sources were used to compile the maps in this guide. (M. Pofahl Aff., RM Ren.App. D at ¶¶ 7–8.) New scribing techniques allowed the addition of "hundreds of thousands of new mileage and city details" to the 1962 *Guide*. (*Id.* at ¶ 9.)

Mileages were obtained from public domain source maps for the 1962 *Guide*. Logistics Systems claims that mileages, then and now, are simply copied from public domain sources onto the Rand McNally maps. However, the evidence demonstrates that mileage values are not obtained from public domain sources for each of the many red and black segments. Rather, mileages between points listed in the public domain maps are used to calculate mileages between the many points added to the Rand McNally maps. (See *e.g.,* M. Pofahl Aff., RM Ren.App. D at Ex. B.) Even if some mileages are copied outright, it is clear that many others are estimated from these publicly obtained mileages.

The procedure described for obtaining mileages for the 1962 *Guide* is described as follows:

> The actual mileage values entered on the maps for the 1962 series were rescaled from individual county maps; I am not aware of any mileage numbers which were copied directly from the source maps. Thus, the rescaling of mileages was an extremely time consuming and laborious process. The rescaling procedure required Rand McNally cartographers to physically measure the actual mileage distances on the individual county maps from one center of town to the center of another town or road junction, and then rescale the map value of each such distance to determine unique mileages for the Black Mileage Segments on the maps....

(*Id.* at ¶ 10.) What Rand McNally does with mileages obtained from public domain sources is to use them as base mileages from which to generate unavailable mileages over several smaller segments. Maps of varying quality and detail are used to estimate mileages throughout the country.

It is undisputed that the 1962 *Guide* is the one on which the subsequent *Guides* are based. (*Id.* at ¶ 12; J. Ragsdell Aff., RM Ren.App. C at ¶ 10.) It also appears that even if pre-1962 *Mileage Guide* editions were not copyrighted, those editions could not be considered a public domain source rendering the collection of data in the 1978 and 1982 *Guides* a result of trivial copying efforts. Not only is it demonstrated that the 1962 *Guide* contains great changes from the previous editions, but Rand McNally's updating of the subsequent editions indicate that from 1962 to 1978, great changes were made in the mileage data. (*See* J. Ragsdell Aff., RM Ren. App. C.) Hence, the sources most likely to provide the updated red and black segment and key point information to Rand McNally in its compilation efforts are copyrighted by Rand McNally. Logistics Systems has not indicated a public domain source that would make the compilation of data any less arduous for Rand McNally than the collating of information from various state, county, and city maps.

The court must therefore address whether the collection of information from the various city, county, and state maps constitutes protectible compilation effort. The evidence before the court indicates that this culling exercise, which includes the breaking down of mileage data into smaller segments as well as an examination of road quality and change and compensation for variations among maps, is sufficient to justify copyright protection over the data so obtained.

As already mentioned, the creation of the maps and collection of the mileage data for all editions involves:

> collection and analysis of a vast amount of source material obtained by Rand McNally. These source materials include

other Rand McNally maps, official highway maps published by states and provinces, county maps, city engineer maps, interstate highway plan sheets and other governmental materials, which Rand McNally obtained by periodically contacting the appropriate governmental agency to continually obtain the latest available maps.

(M. Pofahl Aff., RM Ren.App. D at ¶ 3.) And, as discussed above, the mileage data from such sources is used to generate whole number mileages over new segments of road. In addition, in using these mileages, Rand McNally's concern is with manipulating the figures so that the segments, used as building blocks to calculate mileages over numerous routes, generate accurate mileages over long distances. (A. Winterfeld Aff., RM App. A at ¶ 10.)

In determining the roads on which to measure mileages in the first place, Rand McNally cartographers must determine which roads are of a quality sufficient to be used to calculate these segments. The general method of computing the segment mileages now is similar to that used in the 1962 *Guide:*

> [Cartographers] select end points for these Mileage Segment distances, and, where necessary, physically measure and rescale the map value of each segment distance along the selected roads to determine their own mileages for these segments. Specialized rounding techniques are then applied to all Black Mileage Segments to arrive at the whole mileage numbers which most accurately and uniformly reflect distances between the selected end points. Longer Red Mileage Segment values (comprised of combinations of the Black Mileage Segments along the principal roads) are then calculated to most accurately and uniformly reflect these longer distances. Substantial effort is required and considerable judgment is exercised in analyzing the roads, selecting the Segment end points, measuring and rescaling distances, and rounding and calculate [sic] mileage numbers for each Black and Red

Mileage Segment contained in the *Mileage Guides.*

(A. Winterfeld Aff., RM App. A at ¶ 10.)

Logistics Systems argues that the scaling exercise, used to obtain whole number mileage figures for segments smaller than those obtained from other maps, is a mechanical process requiring little expertise. Accepting this as true, the court notes that Logistics Systems does not assert that the generation of these segment values is not time consuming. Nor does Logistics Systems argue that copying mileage values for thousands of road segments, even were they all readily available from other maps, is not a great mechanical, although not original or creative, endeavor. The number of segments *added* to recent editions of the *Guide* reveals that the *Mileage Guide* contains thousands of red and black segments, and the copying or mechanical calculation of their values required a great deal of time.

It is also clear that a mileage between two points does not remain constant once obtained from its source. Rather, Rand McNally constantly checks and adds to its mileage data, through noting new roads and changes in old roads, catching errors, and adding new mileage segments for which mileages must be calculated. Rand McNally maintains a "network of over 400 private sources" which are periodically contacted "often on a fee basis" to provide information about new roads and road changes. (*Id.*) According to Rand McNally:

> These contacts are generally employed by state highway departments, city engineer offices, planning departments, toll road authorities, state park departments, national park agencies, chambers of commerce, provincial agencies in Canada and Mexican states, etc. ... In all, over 1,500 items of correspondence per year are sent out and received by Rand McNally cartographers to its network of sources and other persons to obtain updated information and corrections for Rand McNally's maps.

(*Id.*) Changes that appear to be relevant to the mileage data include changes in road classifications. (*Id.* at ¶ 4.) Rand McNally's evidence on the changes resulting from updating efforts demonstrates conclusively that much time is expended in each new edition. This checking of mileage changes requires the comparison of roads and road mileages between the Rand McNally maps and the public domain maps. (M. Pofahl Aff., RM Ren.App. D at ¶¶ 4–5.) The additions and changes since the 1962 edition have been great. For example, the 1973 *Mileage Guide* contained over 75,000 changes in road segments, and added 200 new key point cities (which necessitated the generation of hundreds of new key point pair mileages.) (J. Ragsdell Aff., RM Ren. App. C at ¶ 12.) From the 1973 edition, 65,000 road segment changes were made to create the 1978 edition. (*Id.* at ¶ 13.) The 1982 *Mileage Guide* incorporated 55,000 road segment changes. (*Id.* at ¶ 14.) From 1962 to 1982, over 300,000 road and mileage changes were made, (*id.* at ¶ 25), and while it is unclear how much of the estimated $850,000.00 in updating the *Guide* over this period was spent in updating mileage data, it is clear that a great expenditure of effort was required to create and update the modern *Mileage Guides.*

Logistics Systems has twice had the opportunity to present evidence that Rand McNally's efforts in obtaining and updating the mileage data for the red and black segments is a trivial compilation effort. Public domain sources showing the similarity in mileage detail to the detail in the *Mileage Guides* could have been presented to refute Rand McNally's evidence demonstrating both continuous updating and original generation of small segment mileages. The absence of such evidence must be viewed in light of Rand McNally's evidence that even where segment mileage data is exactly copied, it is from numerous maps of states, cities, and counties. Logistics Systems has relied heavily upon its argument that the mileage figures are not derived from field research but are generated from mechanical rounding methods. Yet, its own evidence on this point further convinces the court of the effort involved in Rand McNally's culling and comparison methods in arriving at a suitable mileage value. In its attached exhibits, Logistics Systems submits ten letters and memoranda between Rand McNally and third parties on the proper mileage to attach to the route between Stevens Point and Milwaukee, Wisconsin. (LS Ren.App. D.)

Were the mileage data on the red and black segments contained in a table, such as the table for key point cities, the court would not hesitate to find such a compilation copyrightable. The parties have not addressed what difference, if any, arises from Rand McNally's organization of the segment mileages on maps. (It would be difficult to imagine any tabular arrangement of such data that would be useful, understandable, and efficient. Short of a computer data base, it seems the most useful way to organize this data is directly on a map.) The court finds that the fact that the mileages are arranged on a map does not adversely affect its copyrightability as a compilation. The court concludes that the data on the maps relating to segment mileages is copyrightable.

### 2. Key Point Mileages

■ These mileages are also copyrightable. The effort to compile them derives from the effort expended in determining the mileages of the red and black segments. (A. Winterfeld Aff., RM App. A at ¶ 5.) Hence, it is at least as much a compilation effort, and presumably more, to compile these key point pair mileages as the underlying segment mileages. To determine the mileage between two key points, a combination of the segments that provides the shortest acceptable route between the two points is determined. (*Id.* at ¶ 11.) Rand McNally has shown in this renewed motion that this mileage data is not readily obtainable from other sources. Logistics Systems has not disputed that key point mileages are so generated, or that as a whole, the key point pair mileages are copied directly from public domain sources.

The only public domain source for key point mileages appears to be the pre-1962 key point mileage tables. Even if Rand McNally's compilation efforts are judged as commencing from such a public domain source, the updating work and additional key point mileages alone would bring the compilation effort to the level required for copyright protection as a factual compilation. The evidence demonstrates, for example, that 90% of the key point pair mileages changed from the 1978 to the 1982 edition. (J. Ragsdell Aff., RM Ren.App. C at ¶ 14.)

### 3. Other Data

The court will reserve ruling on the copyrightability of other data from the maps, as well as any contention that the maps themselves are infringed by Logistics Systems' Compu.Guide. It has not been shown that compilation of such information as city and state names or zip codes is within the scope of copyright protection. This ruling is therefore limited to the copying of mileage data.

### B. Ownership of Copyrights

■ The court has already determined that Rand McNally owns the copyrights in the 1973, 1978, and 1982 editions. Rand McNally has also presented unrebutted evidence that the 1962, 1965, and 1966 editions are copyrighted. This creates a presumption of ownership, as well as that the copyrights are valid. 17 U.S.C. § 410(c); *Flick-Reedy Corp. v. Hydro-Line Mfg. Corp.*, 351 F.2d 546, 549 (7th Cir.1965), *cert. denied*, 383 U.S. 958, 86 S.Ct. 1223, 16 L.Ed.2d 301 (1966). The court finds that Rand McNally is the owner of the copyrights in these editions. The court therefore concludes that the mileage data in the 1978 and 1982 editions is copyrightable, that the data is in fact protected by a copyright, and that Rand McNally owns the copyrights in that data.

### II. Existence of Copying by Logistics Systems

The Copyright Act of 1976 provides that

Anyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 118 ... is an infringer of the copyright.

17 U.S.C. § 501(a). Section 106 provides that, subject to sections 107 through 118, the copyright owner, in this case Rand McNally, "has the exclusive rights to do and to authorize ... [the reproduction of] the copyrighted work in copies ... [and the distribution of] copies ... of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending...." 17 U.S.C. § 106(1), (3). Copies are defined as

material objects ... in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device.

17 U.S.C. § 101. This definition of copies is included in the 1976 Act, which became effective on January 1, 1978.

An essential element of copying is that "substantial similarity" exist between the copyrighted and the alleged infringing work. 3 M. Nimmer, *Nimmer on Copyright* § 13.03[A], at 13–17 (1983). The Seventh Circuit has described this test as requiring a showing that the defendant copied from the plaintiff's work and that the copying "went so far as to constitute an improper appropriation." *Atari, Inc. v. North American Philips Consumer Electronics Corp.*, 672 F.2d 607, 614 (7th Cir.), *cert. denied*, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982). "Substantial similarity" is especially important in the context of a factual compilation:

Recognizing a property interest in the collection of information contained in a copyrighted compilation need not raise the spector of the monopolist stifling future intellectual activity. Unfettered access to individual facts would continue to be assured by the traditional requirement of substantial similarity. Since it is the collection as a whole that represents the original work of authorship, only copying sufficient to produce a substan-

tially similar collection would generate potential liability. The protection would not be unlike that conferred on the plot or structure of a novel or play—isolated incidents or scenes may be appropriated provided the literal expression is not lifted, but the taking must not be so extensive as to duplicate the overall structure of the work. A wholesale appropriation of data from a copyrighted compilation would thus itself be an infringement of the author's exclusive rights, regardless of whether there is also a taking of additional copyrightable elements such as arrangement or original prose.

Denicola, "Copyright Collections of Facts: A Theory for the Protection of Nonfiction Literary Works," 81 *Colum.L.Rev.* 516, 531–532 (1981).

The parties have not addressed the substantial similarity test in the context of the quantity and quality of copying necessary to constitute infringement. While copying fewer than all of the mileages may still constitute infringement, copying of a single mileage is clearly not. The degree of copying necessary to finding infringement is not examined. Rather, Logistics Systems argues against a finding of infringement largely because its copying of the data involved rearrangement, from maps and tables to a computer data base. It asserts that it does not produce a map book, and that putting the data into a computer may not be infringement.

## A. Arrangement of Data

With respect to the rearrangement of data, it is undisputed that the data base is completely different in form to the tables and the maps' mileage segments. The court has already indicated that this would not necessarily prevent a finding of copyrightability. (Mem.Op. Dec. 31, 1984 at 733 n. 5.) The court adheres to this view as a general proposition and determines that in this case, the drastic change in format will not alone prevent a finding of unlawful copying.

The court has indicated that the basis for compilation protection is the protection of the compiler's efforts in collecting the data. Hence, the court is in agreement with the conclusion of another court in this district that, while courts often offer the similarity of arrangement as the basis for finding compilation infringement, "[r]are are the cases in which a copier has escaped liability for substantial copying solely because he changed the form of his compilation and thereby avoided similarity of expression." *National Business Lists v. Dun & Bradstreet, Inc.,* 552 F.Supp. 89, 93 (N.D.Ill. 1982). The small significance of arrangement has been largely recognized by commentators discussing compilation infringement. Noting that arrangement of compilations is not creative, but rather dictated by function, Associate Professor Denicola comments:

> The creativity or effort that engages the machinery of copyright, the effort that elicits judicial concern with unjust enrichment and disincentive, lies not in the arranging, but in the compiling.
>
> . . . .
>
> The arrangement formulation ... is dangerously limited. At face value the rationale indicates that the entire substance of a compilation can be pirated as long as the arrangement of data is not substantially copied.... To permit the latecomer to create an identical work through the simple expedient of arranging the appropriated information anew would severely diminish incentive, particularly where stable long-term demand minimizes the advantages of lead time.
>
> . . . .
>
> Nowhere are the deficiencies inherent in the traditional approach more apparent than in the context of computer data bases. Such data bases are in essence simply automated compilations—collections of information stored within a computer memory and capable of being retrieved in various forms by an appropriate search program.... Data bases are clearly permissible subjects for copyright under the 1976 Act, yet it is often senseless to seek in them a specific, fixed arrangement of data.

*Id.* at 528, 531; *see also* Note, 71 *Nw.U.L. Rev.* 833, 841–842 (1977) (feeding compilation into computer data base).

In addition to the changing of the arrangement of a data compilation, the court must consider the fact that the data here has been copied into a computer data base. Data is not merely copied onto a piece of paper, for example, with horizontal instead of vertical columns. The parties have not addressed this more important issue of whether copyright laws understand such "inputting" as copying. Professor Nimmer has explained that, at least after the 1980 amendment to the Copyright Act of 1976, "the input of a work into a computer results in the making of a copy, and hence that such unauthorized input infringes the copyrights owner's reproduction right." 2 M. Nimmer, *Nimmer on Copyright* § 8.08, at 8–104 (1983).[6] Under current law, it is clear that inputting a copyrighted work into a computer would violate the copyright holder's exclusive rights. In this case, as the tabular data may be perceived by way of machine, for example through a print-out, it would seem to be within the definition of copy. The data from the maps can be analyzed similarly—it is simply copied, albeit in another arrangement, into the data base. The way that information must be formatted in order to be of use by a particular computer or program should not prevent a finding of infringement. The irrelevance of the arrangement of data in the context of a computer data base is highlighted by the fact that the Compu. Guide is marketed as a computerized version of the *Mileage Guide* and used at least in part for the generation of mileage data between two points, which is the value of the *Mileage Guide* for commercial truckers.

### B. Degree of Copying

#### 1. 1978 Mileage Tape

This mileage tape contained the key point pair mileages contained in the tables of the 1978 *Mileage Guide.* It is admitted that the tape was simply copied in its entirety into the data base of Logistics Systems' Compu.Guide system. (D. Rinehart Tr., RM App. M at 14–15; Answer to Interrogs. 5(b) and 9, RM App. J.) No copying from the 1982 key point pair mileage tables is claimed; rather the updated key point pair mileages in the Compu.Guide data base are computed from the red and black segment mileages of the 1982 *Guide.* (*Id.;* Rand McNally Memorandum in Support of Renewed Motion p. 25.) This would constitute unprotected copying; however, the parties agree that a disputed issue of fact exists on whether Rand McNally licensed this use. The court simply notes here that the entire mileage tape was incorporated into Logistics Systems' data base.

#### 2. 1978 and 1982 Mileage Segments

Logistics Systems admits to copying more than 100,000 red and black mileage segments from the 1978 *Mileage Guide* into its data base. (D. Rinehart Tr., RM App. M at 80–81.) (Indeed, Logistics Systems began copying the 1973 *Guide* and switched to the 1978 edition after it was published. (D. Shapiro Tr., RM App. C at 80; Answer to Interrog. 2(B)(ii), RM App. C.)) The 1978 *Guide* provided the length of each segment, as well as the city, county, and state names, road names and numbers, vicinity map numbers, and all other geographic information for the Compu. Guide data base. (B. Broderick Tr., RM App. N at 53–55; D. Shapiro Tr., RM App. L at 65, 126, 130–131; D. Rinehart Tr., RM App. M at 18; Answer to Interrogs. 2(B)(ii), 5(B), RM App. J.) The copying is graphi-

---

**6.** In the July 23, 1984 pretrial conference, the court noted that before the December 12, 1980 repeal of former § 117, inputting a copyrighted work in a computer data base may not have been copying under the 1976 Act. *Compare* 2 M. Nimmer, *Nimmer on Copyright* § 8.08, at 8–104 & n. 4 (1983) *with Midway Mfg. Co. v. Artic International, Inc.,* 704 F.2d 1009 (7th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 90, 78 L.Ed.2d 98 (1983). At that conference, Logistics Systems agreed with Rand McNally that inputting a copyrighted work in a computer data base could be an infringement under the 1976 Act and that former § 117 did not limit the protection against such inputting to that provided by the 1909 Act.

cally illustrated by Logistics Systems' Vice-President Daryl Rinehart, who answered affirmatively to the question: "Is it correct to say that the Compu.Guide System is a computerized version of the Household Goods Carrier Bureau Mileage Guide No. 11?" (D. Rinehart Tr., RM App. K at 12.) While the court has been unable to locate the number of red and black mileage segments contained in the 1978 *Guide*, the evidence shows that over 125,000 red and black mileage segments can be found in the 1982 edition. (A. Winterfeld Aff., RM App. A at ¶ 4.) Assuming that about the same number or fewer segments are contained in the 1978 *Guide*, the copying of 100,000 segments would constitute copying at least 80% of the segment mileages contained in the 1978 edition. *All* of the mileage data contained in the Compu.Guide before the publication of the 1982 *Guide* was derived from the 1973 and 1978 *Guides*. (D. Shapiro Tr., RM App. L at 175–176.) The Compu.Guide is advertised as a computerized version of Rand McNally's *Mileage Guides*. (Answer to Interrogs. 7, 8, 11, RM App. J; D. Shapiro Dep., RM App. O at Ex. 5.) There is a suggestion in Logistics Systems' response to the renewed motion that any reference to the *Mileage Guides* for mileage information is merely to check their independently obtained (from state highway maps) mileages for purposes of use as an ICC tariff publication.[7] (Logistics Systems' Response to Renewed Motion p. 14.) This statement, seemingly directed to establishing "slipping," is not supported and is contrary to the weight of testimony by Logistics Systems' own employees as to the direct copying of all mileage information from Rand McNally's copyrighted *Guides*. The evidence is clear that the Compu.Guide data base was derived in full from *Mileage Guide 1978*, and was not derived by check-ing the Compu.Map data base against the mileages contained in the 1978 *Guide*.

When the 1982 *Guide* was published, Logistics Systems did not input the data directly onto the Compu.Guide data base. Rather, Logistics Systems compared the 1982 and 1978 maps, and incorporated the changes that it noted. (D. Rinehart Tr., RM App. M at 12–13, 18.) Logistics Systems did not make the effort of determining from any source, other than the 1982 *Guide* itself, which mileage information changed between the two latest editions. (D. Shapiro Tr., RM App. L at 175–176; D. Rinehart Tr., RM App. M at 10, 12–15, 18.) It is undisputed that Logistics Systems now generates the key point pair mileages from its data base of red and black segments, and not through direct copying from the 1982 *Guide*'s table of key point pair mileages.

As to the copying of the 1978 segment mileages and the 1982 changes and additions to the *Guide*, the court finds copyright infringement. The effort in compiling this data was substantial, and it is clear that they were input directly into the Logistics Systems' Compu.Guide data base. This sort of copying, the exclusive right of the copyright holder under the 1976 Act, is substantial. The copied work is clearly advertised as the computerized equivalent of the 1982 *Guide*, and the ordinary reasonable person would conclude that the data between the two works is basically the same and that Logistics Systems obtained its data from Rand McNally. *See Atari, Inc.*, 672 F.2d at 614.

### III. Laches and Estoppel

The court had determined that a disputed issue of fact prevented the disposition of the laches and estoppel defenses with re-

---

7. Logistics Systems continues to argue that because the *Mileage Guide* is an ICC tariff publication, it must have access to the mileages in order to be useful to carriers and shippers subject to the tariff regulations. The court has already ruled that a mileage guide does not lose copyright protection simply upon its filing as an ICC tariff publication. (Mem.Op. Dec. 31, 1983 at 16–22.) Logistics Systems presents evidence tending to show that the *Mileage Guide* is the only *national* guide on file as a tariff publication. However, Logistics Systems has never argued that it could not market a tariff publication (for example, its Compu.Map). The court noted in the previous opinion that the tariff publication regulations did not seem rigorous or somehow limited to the *Mileage Guide.*

**944**

spect to the mileage data. The court will now examine the evidence to determine if Rand McNally is barred from asserting its claims by laches and estoppel.

■ To establish an estoppel, Logistics Systems must show that:

(1) the party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury.

*Hampton v. Paramount Pictures Corporation,* 279 F.2d 100, 104 (9th Cir.), *cert. denied,* 364 U.S. 882, 81 S.Ct. 170, 5 L.Ed.2d 103 (1960) (cited in *National Business Lists,* 552 F.Supp. at 97). Were Logistics Systems to show an estoppel against Rand McNally, it would prevent Rand McNally not only from bringing an action for past infringement, but for any future infringement as well, including infringement of the 1982 *Guide. National Business Lists,* 552 F.Supp. at 97–98. If a dispute of fact exists as to the existence of laches or estoppel, the court may not resolve that dispute on this motion for summary judgment.

One initial fact is clear. The 1978 and 1982 *Guides* contain copyright notices. Nimmer explains that where a copyright holder does not affirmatively encourage infringement:

[A] holding out sufficient to raise an estoppel may be accomplished by silence and inaction. It would seem, however, that such passive holding out can rarely be established in statutory infringement actions. The mere affixation of the copyright notice on copies of the work if seen by the defendant has been held to constitute a sufficient assertion of the plaintiff's right so as to counter an estoppel based upon a passive holding out.

3 M. Nimmer, *Nimmer on Copyright* § 13.09, at 13–107 (1983).

Logistics Systems supports its estoppel defense by presenting evidence that Rand McNally knew of its intended use of the segment mileage data. The President of Logistics Systems, Donald Shapiro, claims that:

During the period from 1976 through 1980, Logistics Systems, through written and oral communications with Rand McNally, kept Rand McNally informed of the intentions and progress of Logistics Systems in developing its Compu.Guide[ ] system. During conversations in 1978 leading up to Logistics Systems' purchase of a computer tape of key point mileages from Rand McNally, I informed Robert Bretland, Systems Manager, Map Division of Rand McNally, that in addition to using the tape, Logistics Systems was going to extract mileage data from the maps in the *Mileage Guide* in connection with the development of the Compu. Guide[ ] data base. Mr. Bretland did not object, but rather proceeded to sell the computer tape to Logistics Systems.

(D. Shapiro Aff., LS App. 1 at ¶ 8.) The pertinent documentary evidence on this point is undisputed. On April 16, 1976, Donald Shapiro wrote to Robert Bretland asking for information on the Rand McNally data bank of towns, cities, and counties. He explained "We are planning an enhancement to our COMPU.MAP system, and need a source for zip codes, SPLC codes, and latitude and longitude coordinates." He continued:

We have also had several companies ask us about developing a COMPU.MAP system which would provide the same miles as could be obtained from your [*Mileage Guide*]. This would require coding our data base from your maps, and utilizing your Computer tape to retrieve the exact [*Guide*] miles for key points. Do you presently market any computer programs which utilize your ... mileage tape?

Of course, if we decided we would like to use any of your data, we would be cognizant of your copyright rights and hopefully reach some agreement.

(LS App. 15.) Shapiro again wrote to Bretland on May 14, 1976, requesting that Logistics Systems be chosen to produce the mileage data for the next *Guide*. To establish its credibility, Logistics Systems offered to use Rand McNally's segment mileages in its own data base to generate key points and compare the results with Rand McNally's key point mileages. In this letter, it is clear that Logistics Systems had its own mileage information generated from non-Rand McNally sources. (*Id.*) A January 6, 1977 letter demonstrates that the Executive Secretary of the Household Goods Carriers' Bureau had knowledge that Logistics Systems intended to create a data base using Rand McNally's *Guides*. (LS App. 16.) On the same date, the Executive Secretary, Francis Wyche, sent a letter to Rand McNally employee Arthur DuBois, attaching the letter from Logistics Systems to Wyche. That letter explains that Logistics Systems' "Compu.Map" contains mileages obtained from state highway maps. It states that:

> [W]e have also received a number of requests for a COMPU.MAP system based upon the Mileage Guide you distribute. When compared with your Mileage Guide, we have found COMPU.MAP generally averages ¾ of 1% higher.
>
> . . . .
>
> In order to service those customers who prefer your Mileage Guide as a source of miles, *we are presently developing* a new Data Base from Rand McNally's *Standard Highway Mileage Guide*, which we understand is identical to the Mileage Guide which you distribute. Our new Data Base will contain approximately 20,000 key points.... I also understand that you will have a new edition of your Mileage Guide in the fall of 1977. Is this correct? If so, we would plan to incorporate the changes into our new Data Base.

(LS App. 16 (emphasis added).)

Rand McNally's response to this letter was directed to Francis Wyche in a January 27, 1977 letter. In it, Arthur DuBois writes that:

> We are not pleased to hear that [Logistics Systems is] developing a data base from our Mileage Guide even if it is based on an out-of-date Guide. We are reviewing our copyright position on our mileage information before responding on this matter.

(LS App. 16.) The next set of communications between Logistics Systems and Rand McNally occurred in 1978. A June 16, 1978 letter from Shapiro to Bretland explains Logistics Systems' intended use of the mileage tape. He explains that "Logistics Systems recognizes and fully intends to respect Rand McNally's copyright protection of this information." (LS App. 15.) A June 21, 1978 letter from Shapiro to Bretland also explains Logistics Systems' intended use of the tape and a limited offer to order the tape. (*Id.*) The Rand McNally "Fact Sheet" on the tape provides that it, "like the Guide, is fully protected by copyright."

On April 9, 1979, a memorandum from Rand McNally employee T.J. Hermes to DuBois explains:

> I have discovered that Logistics Systems (sales literature attached) has apparently created much of the data base that Hodgkins would like GEO–DATA to provide. Specifically, Fran Wyche tells me that Logistics Systems has manually put *every* mileage from our maps in our Mileage Guide (including state and vicinity maps) and over 35,000 place names into their own data base.... While this may be a copyright violation, it is also the very kind of data base that we and Hodgkins have been discussing.
>
> We need to decide: ... (2) how to handle the Logistics Systems situation[.]

(*Id.*)

■■■■ The court finds that the Bretland affidavit establishes a dispute of fact as to Rand McNally's silent encouragement of Logistics Systems' use of the data. The evidence is unclear as to when Rand McNally knew or should have known of the copying of the segment data. It is possible that any licensing of the tape data was viewed as extending to the mileage seg-

ment data (the court makes no finding on this). The court therefore denies Rand McNally's motion for summary judgment with respect to the copying of the 1982 data because disputed issues of fact remain on the issue of estoppel. The court also determines that a dispute of fact exists on the laches question.

## IV. Fair Use

▆ Recognizing that factual compilations should be granted a broader exception under the "fair use" doctrine, *see* 17 U.S.C. § 107; 3 M. Nimmer, *Nimmer on Copyright* § 1305[A](2) (1983), the court determines that Logistics Systems' use of the 1982 *Mileage Guide* data does not constitute fair use. Most of the factors cited as pertinent to the fair use inquiry do not apply to Logistics Systems' copying, except the fact that the copyrighted work is a factual compilation. The degree of copying involved, the commercial use of the copying, and its competitive value persuade the court that a factual dispute on the fair use defense has not been established by Logistics Systems.

## V. Conclusion

Rand McNally's motion for summary judgment is granted in part and denied in part. The key point pair mileages in the 1978 *Mileage Guide* and the mileage segment data in the 1978 and 1982 *Guides* are copyrightable, and Rand McNally owns valid copyrights in them. A dispute of fact exists on the issues of laches and estoppel and on the extent of authorized use of the 1978 *Guide* tape. Logistics Systems has failed to demonstrate that a dispute of fact exists on the question of fair use.

It is so ordered.